UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF ARKANSAS

FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Jointly Administered Under |
| VEG LIQUIDATION, INC. and | ) | Case No. 5:13-bk-73597-BTB |
| ALL VEG, LLC, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| ———————————————— | ) | |
| | ) | |
| R. RAY FULMER, II, CHAPTER 7 TRUSTEE | ) | |
| | ) | A.P. No. 5:16-ap-_____-BTB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIFTH THIRD EQUIPMENT FINANCE | ) | |
| COMPANY; RYDER INTEGRATED | ) | |
| LOGISTICS, INC.; INTERNATIONAL PAPER | ) | |
| COMPANY; URS REAL ESTATE, L.P; BALL | ) | |
| METAL FOOD CONTAINER | ) | |
| CORPORATION; CROWN CORK & SEAL | ) | |
| USA, INC.; SYNGENTA SEEDS, INC.; TENEO | ) | |
| SECURITIES, LLC; ANDREW TORGOVE; | ) | |
| LAZARD MIDDLE MARKET, LLC; LAZARD, | ) | |
| FRERES & CO., LLC; ALVAREZ & MARSAL, | ) | |
| NORTH AMERICA, LLC; ALVAREZ & | ) | |
| MARSAL PRIVATE EQUITY | ) | |
| PERFORMANCE IMPROVEMENT, LLC; | ) | |
| JONATHAN HICKMAN; SAGER CREEK | ) | |
| VEGETABLE COMPANY F/K/A/ SAGER | ) | |
| CREEK ACQUISITION CORP.; 1903 | ) | |
| ONSHORE FUNDING, LLC; CORTLAND | ) | |
| CAPITAL MARKET SERVICES, LLC; | ) | |
| SANKATY CREDIT OPPORTUNITIES IV, | ) | |
| L.P. (U.S.); SANKATY CREDIT | ) | |
| OPPORTUNITIES IV, LP (CAYMANIAN); | ) | |
| SANKATY MIDDLE MARKET | ) | |
| OPPORTUNITIES FUND, L.P. (US); | ) | |
| SANKATY MIDDLE MARKET | ) | |
| OPPORTUNITIES FUND, L.P. (CAYMANIAN) | ) | |
| AND DOES 1-100, | ) | |
| | | |
| Defendants. | | |

1

**ADVERSARY COMPLAINT**
**AGAINST**
**FIFTH THIRD EQUIPMENT FINANCE COMPANY; RYDER INTEGRATED LOGISTICS,**
**INC.; INTERNATIONAL PAPER COMPANY; URS REAL ESTATE, L.P; BALL METAL FOOD**
**CONTAINER CORPORATION; CROWN CORK & SEAL USA, INC.; SYNGENTA SEEDS,**
**INC.; TENEO SECURITIES, LLC; ANDREW TORGOVE, LAZARD MIDDLE MARKET, LLC;**
**LAZARD, FRERES & CO., LLC; ALVAREZ & MARSAL, NORTH AMERICA, LLC;**
**ALVAREZ & MARSAL PRIVATE EQUITY PERFORMANCE IMPROVEMENT, LLC;**
**JONATHAN HICKMAN; SAGER CREEK VEGETABLE COMPANY F/K/A/ SAGER CREEK**
**ACQUISITION CORP., 1903 ONSHORE FUNDING, LLC; CORTLAND CAPITAL MARKET**
**SERVICES, LLC; SANKATY CREDIT OPPORTUNITIES IV, L.P. (U.S.); SANKATY CREDIT**
**OPPORTUNITIES IV, LP (CAYMANIAN); SANKATY MIDDLE MARKET OPPORTUNITIES**
**FUND, L.P. (US); SANKATY MIDDLE MARKET OPPORTUNITIES FUND, L.P.**
**(CAYMANIAN); AND DOES 1-100.**

COMES NOW R. Ray Fulmer, II, Trustee ("**Plaintiff**"), and for his Adversary Complaint states as

follows against:

"Committee Defendants": Ball Metal Food Container Corp.; Crown Cork & Seal USA, Inc.; Fifth

Third Equipment Finance Company; International Paper Company; Ryder Integrated Logistics, Inc.;

Syngenta Seeds, Inc.; Teneo Securities, LLC; and URS Real Estate, LP; and

"Fiduciary Defendants": Alvarez & Marsal Holdings, LLC; Alvarez & Marsal , North America,

LLC; Alvarez & Marsal Private Equity Performance Improvement, LLC; Andrew Torgove; Jonathan

Hickman; Lazard Freres & Co., LLC; and Lazard Middle Market, LLC;; and

"Sager Creek," "Sager Creek Defendants," or "Second Lien Holders":1903 Onshore Funding,

LLC; Cortland Capital Market Services, LLC; Sager Creek Vegetable Company f/k/a Sager Creek

Acquisition Corp.; Sankaty Credit Opportunities IV, L.P. (US); Sankaty Credit Opportunities IV, L.P.

(CAYMANIAN); Sankaty Middle Market Opportunities Fund, L.P. (US); Sankaty Middle Market

Opportunities Fund, L.P. (CAYMANIAN); and DOES 1-100.

## I.

## JURISDICTION

1. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. ☐

3. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

4. The statutory predicates for this action include 11 U.S.C. §§ 543, 544, 546, 548; 549; 18 U.S.C. §§ 1341, 1343, 1961(1), and Federal Rules of Civil Procedure, Rule 60(b), together with the adopting Bankruptcy Rules common law decided thereon; Arkansas Code §§ 4-59-204, and 4-88-107, together with the common law decided thereon.

## II.☐

## PARTIES

5. Plaintiff R. Ray Fulmer, II ("Plaintiff") is the Debtors' Chapter 7 Trustee.

6. Defendant Fifth Third Equipment Finance Company ("Fifth") is an Ohio corporation maintaining its principal place of business in Michigan, and was a member of the Official Committee of Unsecured Creditors in the Cases (the "Committee").

7. Defendant Ryder Integrated Logistics, Inc., ("Ryder") is a Delaware Corporation maintaining its principal place of business in Florida, and was a member of the Committee.

8. Defendant International Paper Company ("IP") is a New York corporation maintaining its principal place of business in Tennessee, and was a member of the Committee.

9. Defendant URS Real Estate, LP (URS") is a Delaware corporation maintaining its principal place of business in Georgia, and was a member of the Committee.

10. Defendant Ball Metal Food Container Corp. ("Ball") is a Delaware corporation maintaining its principal place of business in Colorado, and was a member of the Committee.

11. Defendant Crown Cork & Seal USA, Inc. (Crown) is a Delaware corporation maintaining its principal place of business located in Pennsylvania, and was a member of the Committee.

3

12. Defendant Syngenta Seeds, Inc., ("SYN") is a Delaware corporation maintaining its principal place of business in Minnesota, and was a member of the Committee.

13. Defendant Teneo Securities, LLC ("Teneo") is a limited liability company, of unknown formation jurisdiction, maintaining its principal place of business in New York, and served as the financial advisor to the Committee.

14. Defendants Fifth, Ryder, IP, URS, Ball, Crown, SYN and Teneo are hereinafter collectively referred to as the **"Committee Defendants."**

15. Defendant Lazard Middle Market, LLC ("LMM") is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

16. Defendant Lazard Freres & Co., LLC  ("LFC") is a New York limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

17. Defendant Alvarez & Marsal Holdings, LLC ("AMH") is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

18. Defendant Alvarez & Marsal, North America, LLC (A&M) is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

19. Defendant Alvarez & Marsal Private Equity Performance Improvement, LLC (AMP) is a Delaware limited liability company maintaining its principal place of business in New York and served as and served as Debtors' financial advisor.

20. Defendant Jonathan Hickman ("Hickman") is a managing director of A&M domiciled in North Carolina, and who served as Debtors' Chief Restructuring Officer.

21. Defendant Andrew Torgove ("Torgove") is an individual employed s Managing Director of Defendant LMM, is domiciled in the State of New York, and served as Debtors' financial advisor.

22. Defendants LMM, LFC, AMH, A&M, AMP, Hickman and Torgove are hereinafter collectively referred to as the **"Fiduciary Defendants."**

4

23. Defendant Sager Creek Vegetable Company ("Sager Creek") was formerly known as Sager Creek Acquisition Corp. Sager Creek is a Delaware corporation maintaining its principal place of business in Arkansas. Sager Creek was an entity formed by the Second Lien Holders to acquire substantially all of the assets of Veg Liquidation.

24. Defendant 1903 Onshore Funding, LLC ("1903") is a Delaware Limited Liability Company maintaining its principal place of business in Boston, Massachusetts, and held an interest as Second Lien Holder.

25. Defendant Cortland Capital Market Services, LLC ("CORT") is a Delaware limited liability company maintaining its principal place of business in New York, and held an interest as Second Lien Holder.

26. Defendant Sankaty Credit Opportunities IV, L.P. (US) (SankatyUS") is a Delaware limited partnership maintaining its principal place of business in Massachusetts, and held an interest as Second Lien Holder.

27. Defendant Sankaty Credit Opportunities IV, L.P. (CAYMANIAN) ("SankatyCAY") is a Caymanian limited partnership maintaining its principal place of business in Boston, Massachusetts, and upon information and belief, held an interest as Second Lien Holder.

28. Defendant Sankaty Middle Market Opportunities Fund, L.P. (US) ("SMUS") is a Delaware limited partnership maintaining its principal place of business in Massachusetts, and held an interest as Second Lien Holder.

29. Defendant Sankaty Middle Market Opportunities Fund, L.P. (CAYMANIAN) ("SMCAY") is a Caymanian limited partnership maintaining its principal place of business in Massachusetts, and upon information and belief, held an interest as Second Lien Holder.

30. Sager Creek, 1903, CORT, SankatyUS, SankatyCAY, SMUS and SMCAY are hereinafter collectively referred to as "**Sager Creek**" and/or "**Second Lien Holders.**"

31. The names and capacities of the DOE defendants are unknown to Plaintiff, who therefore sues

them in fictitious name pending discovery of the true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the DOE defendants is legally responsible in some manner for the economic harm to Plaintiff.

32. Plaintiff is informed and believes, and thereon alleges that each Defendant, including DOE Defendants, was the partner, alter-ego, predecessor and/or successor-in-interest (via de facto merger, merger or other business combination), agent, contractor, joint-venturer, employee, co-conspirator, and/or aider and abettor of each of the remaining Defendants.  In committing the acts alleged herein, each Defendant and DOE Defendant was acting within the course and scope of said legal relationship with actual, constructive and apparent authority to do so, and with actual or constructive knowledge and notice of: 1) the bid and contract terms described herein; 2) the customs, practice and usage applied to industry, statutory and/or regulatory terms and procedures in forming such agreements; 3) the implied covenants of good faith and fair dealing among contract parties and auction participants; 4) the intended reliance by the Court, Debtor and Plaintiff on such representations; and 5) the intended reliance by the Court in the subject Cases on the Defendants' good faith fulfillment of duties, including but not limited to the duty of candor,  imposed by the Bankruptcy Rules, Federal Statutory authority, Arkansas regulatory and statutory authority and the common law, as well as those duties specifically imposed by the Arkansas Code of Professional Responsibility, including but not limited to Rules 3.3, 5.3, 5.4 and 8.3.

## III.

## FACTUAL BACKGROUND

33. This matter arises from the bankruptcy of Veg Liquidation, Inc. (f/k/a Allens, Inc.) and All Veg, LLC (collectively, "**Debtors**"), pending under joint case number 5:13-bk- 73597 (BTB) (the "**Cases**").

34. Financial difficulties beset the Debtors' food canning business in 2011.   Debtors hired

Defendants LMM, LFC, A&M and AMP to market the enterprise to prospective purchasers. A proposed business combination with competitor Seneca Foods failed to close in 2011.

35. Debtors filed voluntary Chapter 11 petitions in this Court on October 28, 2013. Of the 20 largest unsecured creditors, Debtors owed Defendant Ball (can vendor) more than $46 million; Defendant Crown (packaging) more than $18 million; and Defendant Ryder (transportation) nearly $8 million. (Doc #3).

36. The Court appointed Defendant A&M to manage Debtors' financial affairs through Defendant Hickman, Chief Restructuring Officer.

37. On 11/22/13 Debtors filed a motion to sell property pursuant to section 363 of the Bankruptcy Code; to approve Seneca Foods' Asset Purchase Agreement ("APA") as the Stalking Horse Bid, and for related relief. ("**Motion to Sell**") (Doc #229).

38. Debtors' Statements and Schedules (Doc #'s 355-358) revealed DIP lender Bank of America's First Lien of $100 million (Doc #361 at p. 16); Bain Capital affiliates' and others[1] Second Lien of $65 million (Doc #361 at p. 17, Doc #579 at pp. 1-2), and unsecured debt of $108 million (Doc# 361 pp. 56-264).

39. Non-insider avoidable transfers totaled $74,181,615.46. (Doc # 362 pp. 53-135). The Committee Defendants received $18,956,507.30 of that amount, with ninety-two and ½ percent (92.5%) transferred to Defendants Ball, Crown and Ryder.

40. On January 6, 2014, the Court heard testimony concerning the Motion to Sell (Doc #585). Seneca's unadjusted $148 million Stalking Horse Bid reportedly left $32.9 million in real and personal property in the Debtors' estate, and was expected to leave additional millions of dollars of cash in the estate after Closing. (Doc #585 at pp. 9-14). Seneca's APA avoided liquidation and would employ hundreds of Arkansas employees. (Doc#585 at pp. 50-61, 80). Seneca's APA also left Debtors' $74 million in non-insider avoidance claims in the Debtors'

---

[1] 1903 Onshore Funding, LLC, Cortland Capital Market Services LLC, Sankaty Credit Opportunities IV, L.P., Sankaty Middle Market Opportunities Fund, L.P.

estate.

41. The Court approved Seneca's APA as the Stalking Horse Bid, along with certain bid procedures and protections.

42. In 2013, Seneca achieved $1.27 billion in sales. Seneca manufactured more than a billion cans and packaging for itself and others, including customer General Mills and its Green Giant brand. Seneca's in-house logistics network handled three national fleets of trucks, 10 million warehouse feet, and a rail network moving up to 2000 railcars per year. Seneca's operations, in part, competed with those of Defendants Ball, Crown and Ryder.

43. If Seneca's APA won at the auction, Defendants Ball, Crown and Ryder could expect to lose the Allens account to Seneca's in-house capacity; would have little or no recourse on $74 million in uncollectible receivables; and would face disgorgement of almost $18 million in avoidable transfers.

44. For the Second Lien Holders (Sager Creek Defendants), a Seneca auction win would relegate approximately $30 million of their undersecured claim to unsecured creditor status.

45. The Committee Defendants, as potential bidders, did not submit a timely qualifying bid. However, the Sager Creek Defendants and McCall Farms submitted timely qualifying bids to compete with Seneca at the auction.

46. Like the Court-approved Seneca APA, Sager Creek's qualifying bid left Debtor's $74 million in non-insider avoidance claims in the Debtor's estate. (Doc #1321 at pp. 128- 129, *Cross-Examination of Rutsky*).  However, *unlike* Seneca's bid, Sager Creek's $160 million proposal included almost all of Debtors' hard and intangible assets.

47. The auction opened on February 3, 2014. Mark Weinsten of FTI Consulting attended the auction as Sager Creek's financial advisor. At auction the First Lien stood at $80,000,000, and the Second Lien at $65,000,000.

48. Defendant Torgove adjusted Seneca's $148 million bid to approximately $117 million in net

benefit to the Debtors' estate.[2] (Doc#587, p. 8/20:4-5). McCall then bid up to net $119.2 million. (Id. at p. 14/42:15).

49. Defendant Torgove valued Sager Creek's opening bid at net $160 million. Sager Creek admitted on the record to reaching an assumption side-agreement with Defendant Ryder. (*Id.* at pp. 10/29:7-13). Sager Creek then *changed* its bid to include the receipt of all $74 million of non-insider avoidance actions (preferences) as an asset. (*Id.* at p. 11/33:3-7). The auctioneer then re-confirmed the $160 million in net benefit on the record. (*Id.* at p. 13/36:12). The avoidance claims were therefore to be acquired by Sager Creek for no apparent additional consideration.[3]

50. Upon information and belief from a witness present at the auction, after Sager Creek changed its offer to include the avoidance claims, the Committee Defendants' visited caucusing bidder representatives before the next round and told them that further bids *had to* include the transfer of all $74 million in non-insider avoidance claims, along with a covenant not to pursue them.

51. After being faced with that bid requirement, Seneca elected not to bid further. (Id. at p. 14/45:13-15).

52. After bidding closed, Committee counsel Ms. Hershcopf stated the following, in pertinent part: **"With respect to McCall, we'd like them to confirm that they're purchasing the preferences [avoidance actions] and not pursuing them...."** . (Id. at p. 15/47:4-6).

53. Ms. Hershcopf then stated, in pertinent part: **"....and the second issue I'm happy to talk with you about separately, but you might have already heard that when the second lien was bidding that they agreed to.....buy the [sic] preference actions other than the insider actions, and agreed not to pursue them. That's an important thing to the committee. We're happy to discuss that with you separately." "How about this: I actually think that**

---

[2] The adjustments were stated to account for various cash changes through a 2/15/14 Closing, however, the Closing was stated on the record to take place on 2/28/14.
[3] By the time the Sager Creek APA was filed on 2/7/14, the purchase price had changed to $124,781,000. (Doc#563-1 at p. 18).

**what we should do is deal with that in the documentation.  I think, Brian, you are not going to care."** (*Id.* at p. 15/47:20-24, & 48:1-13).

54. McCall Farms' agreed to the Committee Defendants' unauthorized bid requirement. (*Id.* at 48:14-15).[4]

55. The auctioneer closed the bidding at just before 8:00 p.m. E.S.T. on February 3, 2014.  (*Id.* at p. 49:2-5).

56. At the close of the auction, no person declared on the record that the bidding process did not fall under the influence of collusive bidding, non-arms-length negotiating, or adverse domination by any person or entity.

57. The Committee Defendants' unauthorized bid requirement achieved the desired effect and Sager Creek was deemed the Successful Bidder. Debtors' largest three suppliers were spared up to $18 million by the transfer of all $74 million in avoidance claims to Sager Creek Acquisition Corp for no additional consideration.  The claims were not pursued. Sager Creek received $2.5 million in funding from a "major supplier" for the effort.

58. The record does not reflect that the Fiduciary Defendants, Teneo or any other advisor at the auction reconciled the "net benefit" of the Sager Creek bid against the additional hard assets and $74 million of avoidance actions stripped from the Debtors' estate for no apparent additional consideration.

59. Likewise, the auction transcript does not reflect that anyone comparatively scored the bids. There was no explanation of how Sager Creeks' bid remained at net $160 million both before and after the $74 million in avoidance actions were included as sale assets.

60. Long after the auction closed, in fact, the Sager Creek net APA reflected a purchase price of just under $125 million, not $160 million.

61. On Friday, February 7, 2014, Debtors filed a 362-page document set containing Sager Creek's

---

[4] McCall Farms later modified its APA to include the transfer of all non-insider avoidance or preference actions for no additional value, together with a covenant not to pursue them.

and McCall Farms' modified APA's (155 pages and 198 pages respectively). (Doc #563). Debtor filed an amended proposed order on February 9, 2014. (Doc# 583).

62. On February 9, 2014, Sager Creek filed the *Declaration of Mark Weinsten in Support of Adequate Assurance of Future Performance on Assigned Contracts and Leases*. (Doc #579). Therein, Mr. Weinsten declared under penalty of perjury that Sager Creek was to obtain an $80 million revolving credit line; a $32 million term loan; $25.7 million in funding from "Sankaty affiliates;" and *$2.5 million in funding from a major supplier of the company*. (*Id*. at p. 4, paras. 10, 11) (emphasis added). Allen's major suppliers at the time were Ball, Crown and Ryder, and all of them were members of the very Committee that imposed the bid requirement that all avoidance actions transfer away from the Debtor estate with a covenant not to pursue them.

63. At the auction, Sager Creek credit bid the secured portion of the Second Lien debt, part of which was apparently "swapped" with a Sankaty affiliate, then assumed and secured by Sager Creek Acquisition Corp.

64. The Court held a hearing to approve the sale on February 12, 2014. At no point did anyone explain to the Court how Sager Creek received more than $105 million more in Debtor's assets for a mere $8 million more than was bid by Seneca. Upon information and belief, Committee counsel attended the hearing, but did not enter an appearance. The Court was not informed at the hearing that the Sager Creek APA terms had materially changed from those in Seneca's APA approved merely a month before. The Court was not told at the hearing that Debtors' $74 million of avoidance claims were be transferred to Sager Creek for no value, with a covenant not to pursue them. The Court was not told at the hearing of the promise by a supplier to provide $2.5 million in future funding to Sager Creek, or of the Committee's unauthorized bid contingency at the auction concerning the avoidance claims. The bids were not scored and reconciled during the hearing for the Court.

65. The sale to Sager Creek closed on or about February 28, 2014. (Doc#824, p. 2)

66. The docket does not reflect that any recipient of the presumed preferential transfers timely sought a declaratory judgment establishing that any transfer was not a preference.

67. Notwithstanding the further assurances of Mr. Weinsten, Sager Creek failed within a year. Del Monte purchased Sager Creek's assets for a mere $75 million in March of 2015.

68. On 6/6/15, the Court converted the Cases to Chapter 7, and appointed Plaintiff R. Ray Fulmer, II as Trustee. (Docs#971, 976).

69. Sager Creek refused Plaintiff's timely demand to disgorge the avoidance actions.

70. The claims of unsecured creditors whom were not Committee members; whom did not agree to pay Sager Creek money after the Closing; or whose contracts were not assumed, remained unpaid.

71. Due to Defendants' concealment of their adverse domination of, interference with, and collusion concerning the auction, Defendants breached their legal duties to the Court, and to the Debtors.  In doing so, the Defendants engaged in a fraudulent transfer which divested the estate of no less than $74 million in avoidance actions, and up to $32.9 million of real and personal property.

72. Defendants unlawfully conspired, aided & abetted and otherwise furthered their conspiracy through the use of the mails of the United States, wire facilities and/or the Internet. Each Defendant engaged in, at best, a lack of candor with the Court in order to prevent, hinder and/or delay detection of the fraudulent transfer and conversion of estate assets.

73. Defendants collectively owe the estate $74 million in un-rebutted avoidance actions, all other value wrongfully denied to the estate, unjust enrichment or savings secured by their collusion and conspiracy, treble and exemplary damages, interest at the legal rate from February 28, 2014 to the date of judgment, along with attorney's fees and costs.

\ \ \

## IV.

### FIRST CLAIM

### BREACH OF FIDUCIARY DUTY

#### (As against the Fiduciary Defendants)

74. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 73.

75. Debtors employed the Fiduciary Defendants as expert financial advisors. Defendants ASH, A&M and AMP assigned Hickman as Debtors' Chief Restructuring Officer ("CRO") Defendant LMM assigned Defendant Torgove as Debtors' financial advisor.

76. The Fiduciary Defendants owed Debtors a fiduciary duty.

77. The Fiduciary Defendants breached fiduciary duties owed to Debtor by:

    a. Consenting to an unauthorized bid requirement, to wit, that Debtors' non-insider avoidance claims transfer to the Successful Bidder for no additional consideration, contingent on a covenant not to pursue the claims;

    b. Acquiescing to the adverse domination of the auction by the Sager Creek and Committee Defendants, who imposed the unauthorized bid requirement;

    c. Negligently failing to comparatively reconcile the respective bids, thereby relegating Seneca's bid to that of least net value, when it was the bid providing the most net value;

    d. Executing the post-petition fraudulent transfer of Debtor's assets by transferring substantially more assets than provided in the Seneca APA for substantially less comparative value;

    e. Providing material assistance to those with interests in conflict with Debtors' interests, at Debtor's expense, while aiding and abetting a conspiracy to convert Debtors' assets;

    f. Concealing Defendants' conspiracy, collusion and adverse domination from the Debtor and the Court;

    g. Failing to suspend or re-open the auction to mitigate Debtors' economic harm;

13

      h.  Failing to timely notify Debtors of the conflict of interest created by the conduct set forth above; failing to withdraw as a fiduciary; failing to disgorge fees; and failing to timely instruct Debtors to obtain new advisors to mitigate their damages;

      i.  Deepening Debtor's insolvency through the acts, or failures to act, as set forth above.

78. The Fiduciary Defendants' pre-conversion conduct constituted a breach of contract and fiduciary duty, a breach of heightened duty, and negligence.

79. The Fiduciary Defendants' pre-conversion conduct caused, or was a substantial factor in causing economic harm to the Debtors.

80. The Fiduciary Defendants acquiesced to the adverse domination, collusion and conspiracy, and sacrificed the interest of the Debtors' estate, in order to instead protect the financial interests of the First and Second Lien Holders and the Committee Defendants whom would collectively lose more than $118 million if Seneca's bid were accepted.

81. The object of the adverse domination, collusion and conspiracy was unlawful, in that it took place through: a) the promise of a "major supplier" to pay Sager Creek Acquisition Corp $2.5 million; b) the fraudulent transfer from the Debtors' estate of $74 million in actionable avoidance claims in order to prevent Debtors and the Trustee from recovering up to $18 million of preference payments to Defendants Ball, Crown and Ryder; c) Re-engaging one or more Committee Defendants as a vendor(s) to Sager Creek as consideration for participation in the conspiracy; d) engaging in unfair business practices and unfair competition through collusive bidding against competitor Seneca; and e) concealment of the unlawful conduct from the Court and Plaintiff.

82. Defendants' unlawful conduct renders the Court's order approving the sale to be non-preclusive of the remedies sought by Plaintiffs herein pursuant to Federal Rule 60(b)(3).  The adverse domination of the auction, and the adverse interest held by the Fiduciary Defendants affords standing to Plaintiff Trustee Ray Fulmer, II as the Real Party in Interest to seek the relief set forth herein pursuant to 11 U.S.C. sections 543, 544, and or 546.

83. In negligence, the Fiduciary Defendants breached their duty of care to the Debtors by negligently failing to timely disclose to Debtors' and the Plaintiff the adverse domination and unlawful conduct of the Sager Creek Defendants and the Committee Defendants; or otherwise taking timely action to invalidate or re-open the auction to mitigate Debtors' loss.

84. The Fiduciary Defendants' breach of duty was the actual cause, or was a substantial factor in causing, financial harm to the Debtors and to the Debtors' estate.

### V.

### SECOND CLAIM

### FRAUDULENT TRANSFER

(As against all Defendants)

85. Plaintiff incorporates by reference the allegations in paragraphs 1 through 84.

86. The Defendants conspired to transfer tangible and intangible property (including more than $74 million in non-insider avoidance claims) from the Debtors estate to the Sager Creek Defendants for no consideration, or inadequate consideration.

87. The Court-approved Seneca APA did not permit transfer of non-insider avoidance claims. The Defendants buried the avoidance claim transfer in hundreds of pages of Sager Creek and McCall Farms APA's filed and made available a business day before the 2/12/14 hearing. No filing candidly alerted Court to the material changes from the previously-approved Seneca APA, or contained a comparative reconciliation of the assets to be transferred with valuations. The Defendants never candidly told the Court at the hearing that the Sager Creek and McCall APA's materially differed from the Court-approved Seneca APA. Per the Sager Creek APA, an asset reconciliation and schedule, complete with line-item valuation computations, was to be delivered to Sager Creek within 5 days of the Closing. No draft schedule was provided to the Court.

88. The Defendants likewise did not file the final closing sale documents with the Court. Accordingly, neither the Debtors, nor the Court or Chapter 7 Trustee were able to scrutinize the

transaction with the final adjusted reconciliation sheet.

89. The transfer not only removed valuable assets from the Debtors' estate for no consideration, but also thwarted future attempts to prosecute the avoidance actions by rendering the claims valueless.

90. The Defendants formed and concealed the conspiracy in order to: a) permit the Committee Defendants to compete unlawfully with Seneca Foods in the canning, packaging and transportation industries; b) spare the Committee Defendants the burden of nearly $18 million in avoidance claims; c) reward the Committee Defendants with continued vendor status as *quid pro quo* for their adverse domination of the auction; d) permit Sager Creek to falsely outbid Seneca, through the application of economic artifice, and take title to substantially all the assets of the Debtor for a substantially-lower net value than that offered by Seneca; e) spare the Sager Creek Defendants the relegation of their Second Lien to unsecured debt status; f) permit the Sager Creek Defendants to swap their unsecured loan to Debtors with a secured loan from a Sankaty affiliate; and g) permit Sager Creek to obtain the promise of $2.5 million from a "major supplier."

91. Defendants' conduct and lack of candor constitutes a fraud on the Court.

92. The transfer of the avoidance actions and all other assets for no consideration or inadequate consideration is a post-petition fraudulent conveyance (as defined by 11 U.S.C sections 548 and 549, and section 4-59-204 of the Arkansas Code), in that the transfer was obtained through a fraud on the Court; in return for no consideration or reasonably equivalent value; with the actual intent to hinder, delay or defraud creditors; and to convert the assets of the Debtors' estate for the sole benefit of the Defendants.

93. Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors. The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the

16

execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

94. Defendants' conduct was the actual cause of economic loss to the Debtors' estate and the unsecured creditors, in an amount according to proof.

95. Defendants' adverse domination and conspiracy to conceal unlawful conduct render any order approving the subject sale to have been procured by Defendants' fraud, and therefore non-preclusive of the remedies sought by Plaintiffs herein. Such adverse domination likewise affords standing to Plaintiff to seek the remedies set forth below pursuant to 11 U.S.C. section 544, and or 546.

## VI.

### THIRD CLAIM

### CONSPIRACY

#### (As against all Defendants)

96. Plaintiff incorporates by reference the allegations in paragraphs 1 through 95.

97. 11 U.S.C. section 363(n), together with Arkansas statutory and common law, prohibit fraud, collusion, adverse domination or undue influence from being exerted over auction proceedings. The sale price cannot result from an agreement among potential bidders.

98. The Committee Defendants held $67.56 million of unsecured debt, and were potential bidders for purposes of 11 USC section 363(n).

99. The Debtors auctioned their assets on February 3, 2014.

100.     If Seneca won the auction, much of the $65,000,000 Second Lien would become unsecured. However, if the Sager Creek Defendants became the Successful Bidder, the Second Lien Holders (whom formed and owned Sager Creek Acquisition Corp for purposes of the auction) would have the opportunity to swap their under-secured debt with a Sankaty affiliate, which would then obtain a fully-secured note from Sager Creek Acquisition Corp.

17

101.    The Sager Creek Defendants used the secured amount of their Second Lien as a credit bid
in order to over-bid Seneca's $117 million bid.

102.    Upon information and belief derived from an auction participant, in the second round
caucus session after the Sager Creek Defendants announced that they would take all avoidance
action assets from the Debtors' estate, the Committee Defendants told bidders off the record that
their bids "had to" contain the same or similar transfer provision, with a covenant not to pursue the
claims. The implication from the context of the remark was that non-compliant bids would either
not be accepted, or would be the subject of an objection by the Committee. This unauthorized bid
requirement would save the Committee Defendants almost $18 million in avoidance claims.

103.    The auction transcript also suggests that one or more Committee Defendants were to be re-
engaged by Sager Creek as prime vendors.  This would directly benefit the Committee
Defendants, whom were owed more than $67 million in pre- and post-petition receivables.

104.    The auction participants did not state on the record after bidding closed, or during the
2/12/14 Motion to Sell hearing, that the bids did not result from fraud, collusion, adverse
domination or undue influence.

105.    Bank of America, the First Lien Holder and DIP financing entity, referred and approved
the appointment of the Fiduciary Defendants, with whom Bank of America had worked on several
other bankruptcies. Bank of America expected the Fiduciary Defendants to successfully auction
Debtors' assets and get the First Lien paid.  Time was of the essence, as the auction was held on
the eve of the grower contracting season, and barely more than a week before Bank of America's
DIP financing expired. (Doc#585, p. 26). If the auction was unsuccessful, or had to be cancelled or
delayed, the reorganization would likely fail.

106.    Accordingly, when the Committee Defendants' imposed their unauthorized bid
requirement during the auction, the Fiduciary defendants were faced with an immediate conflict of
interest of whether to suspend the auction due to the collusion and misconduct, or let the Debtor

18

be stripped of more than $74 million in assets for expediency.

107.     The Fiduciary Defendants controlled all material aspects of the Debtors' financial affairs,

however, the Committee Defendants held implicit leverage over the auction. A litigated

Committee objection on the eve of the grower contract period and the looming DIP expiration

would cause a delay fatal to the Debtors' reorganization.

108.     Moreover, a litigated objection would delay payment to the Fiduciary Defendants' frequent

business associate, Bank of America.

109.     If the Fiduciary Defendants suspended the auction, reported the adverse domination to the

Court, and sought to re-open the bidding, similar consequences of delay would result.

110.     The only option that did not seemingly risk Debtors' destruction and invoke the ire of

Bank of America was to acquiesce to the Committee's and Sager Creek's conspiracy to impose the

unlawful bid requirement.

111.     With the success of the auction hanging in the balance, the Fiduciary Defendants had every

improper reason to incorrectly, mistakenly, negligently or intentionally over-value the Sager Creek

bid by failing to comparatively reconcile all bids against the assets left in the estate.

112.     The Defendants remain in exclusive control of the bid valuation notes, documents and

dated spreadsheets, along with applicable metadata on the native documents. The acquired asset

closing schedules required by the APA's to be generated at and before the Closing do not appear

on the Case docket. However, the available data correlated from the auction transcript, the APA's

and the Statements & Schedules, permit Plaintiff to believe that the Sager Creek bid could not

have topped the Seneca bid in the absence of miscalculation, unsupported financial assumptions or

employment of economic artifice by the Fiduciary Defendants.

113.     According to available documents, Sager Creek agreed to pay $8 million more than the

Seneca bid in order to receive $105 million more in assets.

114.     Based upon the auction transcript, the Declaration of Mark Weinsten, and the various

19

iterations of the APA's, Plaintiff can reasonably deduce that, to win the auction, the Sager Creek

Defendants purchased the Committee Defendants' participation in the conspiracy with the transfer

of the avoidance claims and the promise of engaging of the controlling Committee Defendants as

Sager Creek's prime vendors.

115.    From a financial and future business standpoint, Ball, Crown and Ryder needed Seneca to

lose the auction to Sager Creek. If Seneca won the auction, its vertical integration of can

production, packaging and logistics offered Ball, Crown and Ryder no chance to recover their $67

million in receivables, and little hope of remaining prime vendors in the future. Since Seneca

would not succumb to the Committee's bid requirement concerning the avoidance claims, a

Seneca win at the auction meant that Ball, Crown and Ryder would also remain vulnerable to

almost $18 million in avoidance claims.

116.    From a similar standpoint, the Sager Creek Defendants also needed Seneca to lose the

auction. If Seneca won the auction, almost $30 million of the Second Lien would be relegated to

unsecured status and would then stand in line as $32.9 million in property and $74 million in

voidance claims were slowly liquidated to satisfy more than $138 million in unsecured creditor

debt. Agreeing with the Committee to strip the Debtors' avoidance actions, keep the Committee

Defendants at no added expense, and receive $2.5 million in funding from a "major vendor" was a

painless method to win the auction.  With the win came the crucial ability to swap the under-

secured Second Lien with a Sankaty affiliate, who would fully secure the new finncing through the

Sager Creek entity.

117.    The Defendants actually executed on their scheme to strip Debtors avoidance claims and

other assets for no consideration. The Committee Defendants were potential bidders that did not

submit a competing bid.  At the opening of the auction, Sager Creek added the avoidance claims to

their APA as "included assets" and announced the assumption agreement with Ryder.  Apparently

on cue, the Committee then visited bidders in their break-out rooms and imposed the unauthorized

bid requirement. At the end of the auction, the Committee expressly revealed the bid requirement.

118.    For their part, the Fiduciary Defendants and the auctioneer agreed on the record to the false $160 million net valuation of the Sager Creek APA.  This permitted Sager Creek to falsely top the Seneca bid.  Seneca wisely did not submit to the unlawful demands of the Committee and refused to bid further.  Sager Creek was declared the Successful Bidder.

119.    Only after the auction closed, at the proverbial eleventh hour, did the heavily-modified155-page Sager Creek APA get revised to reflect only a net $124 million purchase price, with no comparative reconciliation of the transferred avoidance claims.  Near the same time, Sager Creek filed the Declaration of Weinsten detailing a major vendor's commitment to pay $2.5 million to Sager Creek, and the Second Lien Holders' note swap with a Sankaty affiliate.

120.    Not a candid word of the scheme was disclosed to the Court at the 2/12/14 sale hearing. The Committee Defendants did not appear.  The Court was never given reason to ask whether the auction resulted in a material change to the Seneca APA approved a month earlier, i.e. that avoidance claims had become included assets for no consideration instead of remaining excluded assets to convert to cash for the estate.

121.    By following through on the conspiracy, Defendants succeeded in transferring substantially all of Debtors' assets to Sager Creek for substantially-less net economic value to the estate than would have been realized had the Seneca APA prevailed.

122.    Defendants knew or had reason to know of the scheme to engage in the fraudulent transfer, and the consideration each participant would receive for agreeing to engage in the unlawful acts. Each Defendant participated in, or acquiesced to, the scheme.  Each Defendant aided and abetted the others in executing on their unlawful scheme.  Each defendant concealed the scheme and its consequences from the Court.

123.    Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce

21

a breach of the Fiduciary Defendants' respective contracts with the Debtors. The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

124.      Defendants' conduct was the cause, or was a substantial factor in causing, economic harm to the Debtors' estate, in an amount according to proof, but at a minimum including $32.9 million in hard assets, along with the $74 million in avoidance actions transferred for no value whatsoever.

## VII.

## FOURTH CLAIM

### AIDING AND ABETTING

(Plaintiff as Against All Defendants)

125.      Plaintiff incorporates by reference the allegations in paragraphs 1 through 124.

126.      11 U.S.C. section 363(n), and Arkansas statutory and/or common law, prohibit fraud, collusion, adverse domination or undue influence from being exerted over auction proceedings. The sale price cannot result from an agreement among potential bidders.

127.      The Committee Defendants held $67.56 million of unsecured debt, and were potential bidders for purposes of 11 USC section 363(n).

128.      After the February 3, 2014 auction, Sager Creek Acquisition Corp emerged as the Successful Bidder as a result of the adverse domination, collusion and conspiracy of the Sager Creek Defendants, the Committee Defendants and the Fiduciary Defendants.

129.      Upon information and belief, the Defendants agreed that the Committee would impose a bid requirement at the auction wherein all non-insider avoidance claims must be transferred to the Successful Bidder subject to a covenant not to pursue the claims. The Committee would inform

the bidders that the Committee would not support, and would object to, bids that did not include the transfer of the avoidance actions away from the control of the Debtors' estate.

130.     Using Debtors' assets, the Sager Creek Defendants bought the participation of the Committee Defendants in the conspiracy.  They actually executed on their scheme to strip Debtors avoidance claims and other assets for no consideration. The Committee did not submit a qualifying bid.  At the opening of the auction, Sager Creek added the avoidance claims to their APA as "included assets" and announced the assumption agreement with Ryder.  On cue, the Committee then visited bidders in their break-out rooms and imposed the unauthorized bid requirement. At the end of the auction, the Committee expressly revealed their bid requirement when it instructed McCall to include the avoidance claims in their APA.

131.     For their part, the Fiduciary Defendants and the auctioneer agreed on the record to the false or incorrect $160 million net valuation of the Sager Creek APA.  This permitted Sager Creek to falsely top the Seneca bid.  Seneca wisely did not submit to the unlawful demands of the Committee and refused to bid further.  Sager Creek was declared the Successful Bidder, with McCall Farms as the Successful Back-up Bidder.

132.     Days after the auction ended, on the eve of the hearing to approve the sale at the auction, Sager Creek's heavily-modified155-page APA was submitted to the Court with mere $125 million purchase price, with no comparative reconciliation of the transferred avoidance claims.  Near the same time, Sager Creek filed the Declaration of Weinsten detailing a major vendor's commitment to pay $2.5 million to Sager Creek, and Second Lien Holders' note swap with a Sankaty affiliate.

133.     Not a candid word of the scheme was disclosed to the court at the 2/12/14 sale hearing. The Committee Defendants did not appear.  The Court was never given reason to ask whether the auction resulted in a material change to the Seneca APA approved a month earlier, i.e. that avoidance claims had become included assets for no consideration instead of remaining excluded assets to convert to cash for the estate.

23

134.    By following through on the conspiracy, Defendants succeeded in transferring the Debtors' assets to Sager Creek for substantially-less net economic value to the estate than would have been realized under the Seneca APA.

135.    Each Defendant knew of the scheme to engage in the fraudulent transfer, and knew of the consideration each participant would receive for agreeing to engage in the unlawful acts. Each Defendant participated, agreed to participate in the scheme, or acquiesced to the scheme. Each Defendant aided and abetted the others in executing on their unlawful scheme. Each defendant concealed the scheme and its consequences from the Court.

136.    Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors. The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

137.    Defendants' conduct was the cause, or was a substantial factor in causing, economic harm to the Debtors' estate, in an amount according to proof, but at a minimum including $32.9 million in hard assets, along with the $74 million in avoidance actions transferred for no value whatsoever.

## VIII.

## FIFTH CLAIM

## CONVERSION

(Plaintiff against All Defendants)

138.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 137.

139.    Debtors owned substantial assets in the form of $32.9 million in real and personal property

24

and more than $74 million non-insider avoidance claims.

140.　　Defendants divested Debtors' of the property for no value through a fraudulent transfer resulting from a conspiracy to unlawfully and adversely dominate the Debtor and its auction, and to conceal the scheme from the Court.

141.　　Defendants took possession of the subject property in the days and months after February 28, 2014.

142.　　Defendants prevented plaintiff from accessing or having use of the property, and refused to return the property after demand.

143.　　Due to adverse domination of the Debtors' auction proceedings, the exclusive control of Debtors' financial affairs, and the concealment of the divestment scheme from the Debtors and the Court, the Debtors did not consent to the divestiture as Real Parties in Interest.

144.　　Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

145.　　Defendants' conduct was the cause, or a substantial factor in causing, economic harm to the Debtors' estate.

## IX.

## <u>SIXTH CLAIM</u>

### INDUCING BREACH OF CONTRACT

(Plaintiff Against the Committee and Sager Creek Defendants)

146.　　Plaintiff incorporates by reference the allegations in paragraphs 1 through 145.

147.    Debtors entered into services agreements with the Fiduciary Defendants.

148.    The Committee and Sager Creek Defendants knew of the existence of the subject service agreements.

149.    Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

150.    The Fiduciary Defendants breached their contract with the Debtors as a result.

151.    Debtors' estate was financially harmed as a result, in an amount according to proof, but at a minimum including $32.9 million in hard assets, along with the $74 million in avoidance actions.

152.    The conduct of the Committee Defendants and the Sager Creek Defendants caused, or was a substantial factor in causing, the breaches of contracts to occur.

## X.

### SEVENTH CLAIM

### INTENTIONAL INTERFERENCE

### WITH CONTRACTUAL RELATIONS

(Plaintiff against all Defendants)

153.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 152.

154.    There existed two sets of contractual relations: 1) an approved but incipient agreement between Debtors and Seneca Foods, which, absent interference, would result in a binding agreement ("Seneca APA"); and 2) service agreements between the Debtors and the Fiduciary

26

Defendants.

155.     The Defendants knew of the existence of all contracts described herein.

156.     The unlawful conduct of the Defendants prevented Debtors' performance on the Seneca APA; and eliminated the Fiduciary Defendants' performance on their services agreements with the Debtor.

157.     The Defendants intended to disrupt the Debtors' performance on the Seneca APA. Further, the Defendants could not obtain their unlawful goal of divesting the Debtors without compelling the Fiduciary Defendants to breach their duties to the Debtors, and thus implicitly intended to disrupt the Fiduciary Defendants' performance on their contracts with the Debtors.

158.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

159.     Defendants' conduct caused, or was a substantial factor in causing, economic harm to the Debtors.

## XI.

## EIGHTH CLAIM

## INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

(Plaintiff as against all Defendants)

160.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 159.

161.     A contractual relationship existed that, absent interference, probably would have resulted

in substantial economic benefit to the Debtors in the form of the Court-approved Seneca APA.

162.      The Defendants knew of the existence of all contractual relations described herein.

163.      The unlawful conduct of the Defendants (i.e. conspiracy and collusion to falsely top the Seneca bid and effect a fraudulent transfer of Debtors' assets for no value), as set forth above, destroyed economic relations with Seneca and divested Debtors of more than $100 million in assets for no consideration.

164.      By engaging in such conduct, Defendants intended that the disruption of the Seneca relationship take place and/or knew that such disruption was substantially certain to occur.

165.      The Defendants intended to disrupt Debtors' performance on the Seneca APA.

166.      The Debtors' relationship with Seneca was disrupted as a result of Defendants' interference.

167.      Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

168.       The conduct of the Defendants caused, or was a substantial factor in causing, such economic harm to the Debtors.

\ \ \

\ \ \

\ \ \

28

XII.

## NINTH CLAIM

## NEGLIGENT INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

(Plaintiff as against all Defendants)

169.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 168.

170.     A contractual relationship existed that, absent interference, probably would have resulted in substantial economic benefit to the Debtors in the form of the court-approved Seneca APA.

171.     The Defendants knew or should have known of the existence of all contractual relations described herein.

172.     Defendants owed a duty to exercise reasonable care concerning the economic relations between Debtors and Seneca Foods, and knew or should have known that the contractual relations between Debtors and Seneca would be disrupted if Defendants did not act with reasonable care.

173.     The Defendants breached such duty by providing incorrect bid data, negligently failing to reconcile the competitive bids, and thereby mistakenly and negligently concluding that Sager Creek's bid was a higher bid than Senaca's bid.  The mistake resulted in the approval of the Sager Creek APA, which required transfer of Debtors' assets for no value.  The Defendants failed to exercise such reasonable care, and in doing so, destroyed the economic relations with Seneca, thereby divesting Debtors of more than $100 million in assets for no consideration in return.

174.     The Debtors' relationship with Seneca was disrupted.

175.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the

29

execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

176.       Defendants' negligent conduct of the Defendants caused or was a substantial factor in causing, economic harm to the Debtors.

## XIII.

## TENTH CLAIM

## DECEPTIVE TRADE PRACTICES

(Plaintiff against all Defendants)

177.       Plaintiff incorporates by reference the allegations in paragraphs 1 through 176.

178.       On or about February 28, 2014, the Defendants' conspired to fraudulently transfer more than $100 million of Debtors' assets for no consideration to Sager Creek Acquisition Corp.

179.       Defendants did not report their unlawful objective and the consequences of their conspiracy to the Court.

180.       To achieve the unlawful objective, Defendants misrepresented the economic values of bids at Debtors' auction, and in doing so deceived Stalking Horse Bidder Seneca Foods, the Debtors, and the Court into believing that Sager Creek Acquisition Corp submitted the highest and otherwise best bid for the Debtors' assets, when the economic value of the bid was actually the lowest bid.

181.       Defendants furthered their conspiracy by providing consideration for participants in the form of millions of dollars of Directed Benefit to the Committee Defendants, millions of dollars of Directed Benefit to the Sager Creek Defendants, and future business benefit to the Fiduciary Defendants.

182.       The Defendants' conduct constitutes a fraudulent transfer as defined by Arkansas Code section 4-59-204, and an unfair and deceptive trade practice as defined by Arkansas Code section 4-88-107.

183.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

184.     Defendants' unlawful and intentional conduct of engaging in unfair and deceptive trade practices caused, or was a substantial factor in causing, economic harm to the Debtors.

## XIV.

### ELEVENTH CLAIM

### EQUITY

### RESCISSION AND/OR REFORMATION

(Plaintiff as against the Fiduciary Defendants)

185.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 184.

186.     Debtors entered into service agreements with the Fiduciary Defendants before and after the filing of the Cases.  The Debtors performed all obligations owed under such agreements.

187.     Plaintiff is informed and believes that the subject agreements may contain exculpatory provisions, or other provisions requiring indemnity by the Debtor or others that survive termination, and operate regardless of fault or contribution by the Fiduciary Defendants.

188.     The covenant of good faith and fair dealing is implied in every contract entered in New York and Arkansas.

189.     On or about February 28, 2014, the Fiduciary Defendants aided and abetted the fraudulent transfer of more than $100 million of Debtors' assets for no consideration to Sager Creek Acquisition Corp.

190.    Thereafter, the Fiduciary Defendants further concealed the unlawful objective, the adverse domination of the Debtors by the Committee Defendants and the Sager Creek Defendants, and the consequences of their conspiracy from the Court.

191.    The Fiduciary Defendants breached the subject contracts, breached their fiduciary duty to Debtors, and violated the covenant of good faith and fair dealing.

192.    The Debtors did not intend to enter into an agreement with the Fiduciary Defendants that permitted those Defendants to retain indemnity or exculpatory benefit from a contract they breached with the Debtors through deceitful and unlawful acts taken against the Debtors' interest.

193.    In equity, Plaintiff requests that, to the extent such agreements contain exculpatory clauses or indemnity provisions in favor of the Fiduciary Defendants that survive termination, that the Court order such contracts rescinded and that the Fiduciary Defendants be compelled by Court order to disgorge and return to Plaintiff all fees obtained from the time of the concealed breach of fiduciary duty to the present.

194.    Alternatively, in equity, Plaintiff requests that, to the extent such agreements contain exculpatory clauses or indemnity provisions that survive termination by fraud and deceit, that the court order such contracts reformed to render such exculpatory or indemnifying provisions null and void as against public policy, and that the Fiduciary Defendants be compelled by Court order to disgorge and return to Plaintiff all fees obtained during the time of the concealed breach of fiduciary duty.

195.    The unlawful conduct of the Defendants was the direct cause of the Debtors' harm, and/or was a substantial factor in causing such harm.

\ \ \

\ \ \

## XV.

## TWELFTH CLAIM

### EQUITY

### UNJUST ENRICHMENT

(Plaintiff as against all Defendants)

196.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 195.

197.     The Debtors owned property in the form of real and personal property, including more than $74 million in un-rebutted avoidance claims.

198.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

199.     The Defendants misappropriated Debtors' property.

200.     The Defendants were unjustly enriched by the misappropriation of Debtors' property.

201.     Defendants' misappropriation of Debtors' property caused, or was a substantial factor in causing, economic loss to Debtors in an amount according to proof.

\ \ \

\ \ \

\ \ \

## XVI.

### THIRTEENTH CLAIM

### DECLARATORY RELIEF

(Plaintiff Against All Defendants)

202.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 201.

203.     <u>COUNT 1- Rule 60 Relief</u>: An actual, present and justiciable controversy exists between the Plaintiff and Defendants concerning the fraudulent transfer described above, the concealment and lack of candor by the Defendants regarding same, and the Sale Order issued by the court. The unlawful transaction, and concealment of same by the Defendants constitutes a fraud on the Court, the U.S. Trustee, the Debtor and Plaintiff herein, compelling Federal Rule of Civil Procedure, Rule 60 relief from any preclusive effect of such order, if any there is. The Debtors were adversely dominated by the Defendants, some of which enjoyed complete control over the Debtors' financial affairs. Due to such adverse domination, Debtors were not represented before or after the Sale Order hearing, did not participate in such hearing, and like the Court, did not have knowledge of the concealed conspiracy and fraudulent transfer. Plaintiff seeks any and all necessary relief from such Sale Order, to the extent it would otherwise afford any preclusive effect to the Defendants herein.

204.     <u>COUNT 2- Rescission and/or Reformation</u>: An actual, present and justiciable controversy exists between the Plaintiff and Defendants concerning the fraudulent transfer described above, the conspiracy from which it arose, and concealment and lack of candor by the Defendants regarding same. The concealment by the Defendants constitutes a fraud on the Court, the U.S. Trustee, the Debtor and Plaintiff herein. Plaintiff therefore seeks a declaration by this Court that any and all contracts existing between the Debtors and Defendants herein, to the extent such contracts contain exculpatory or indemnity provisions that survive breach and termination without fault, be rescinded and/or reformed to have no such effect.

34

## XVII.

### PRAYER FOR RELIEF

Wherefore Plaintiff requests that the Court award the following in favor of Plaintiff and against Defendants, in excess of the minimum jurisdiction of this court as follows:

FIRST CLAIM - BREACH OF FIDUCIARY DUTY against the Fiduciary Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SECOND CLAIM- FRAUDULENT TRANSFER as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

THIRD CLAIM- CONSPIRACY as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

FOURTH CLAIM- AIDING AND ABETTING as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

FIFTH CLAIM- CONVERSION as Against All Defendants: Compensatory, Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SIXTH CLAIM- INDUCING BREACH OF CONTRACT as against the Committee Defendants and Sager Creek Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SEVENTH CLAIM- INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

EIGHTH CLAIM- INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

NINTH CLAIM- NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

TENTH CLAIM- DECEPTIVE TRADE PRACTICES: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

ELEVENTH CLAIM- RESCISSION/REFORMATION: as against the Fiduciary Defendants: Rescission of the subject contracts, or alternatively, reformation and elimination of exculpatory or indemnity provisions that purportedly survive termination due to breach or fraud; compensatory, consequential, exemplary and treble damages according to proof; interest at the legal rate from the February 28, 2014 to the present, attorneys fees, and costs of suit;

TWELFTH CLAIM- UNJUST ENRICHMENT: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

THIRTEENTH CLAIM- DECLARATORY RELIEF: as against all Defendants:

Count I:  A declaration by this Court that the Sale Order entered by this Court was obtained through conduct by the Defendants which constitutes a fraud on this Court, and thereby in equity eliminating any potential preclusive effect of the Sale Order, if any there is, as related to the Plaintiff's claims alleged herein.

Count II: Further, to the extent that applicable contracts entered into between Debtors and Defendants herein, to the extent such contracts contain exculpatory or indemnity provisions that survive breach and termination without fault, be rescinded and/or reformed to have no such effect.

PLAINTIFF R. RAY FULMER, II, hereby also requests any other proper and further relief as the Court in its discretion may award.

R. Ray Fulmer, II
Ledbetter, Cogbill, Arnold & Harrison, LLP
622 Parker Avenue
P.O. Box 185
Fort Smith, Arkansas  72902
Phone:  479-782-7294
Facsimile:  479-782-1493
rrf@lcahlaw.com


By:   Whitney A. Davis
THE LAW OFFICES OF
WHITNEY A. DAVIS
420 Throckmorton Street, Suite 200
Fort Worth, TX 76012
(Texas Bar 24084843)
(California Bar 149523)
Phone: 916-719-6827

and

WILLIAMS & ANDERSON PLC
James E. Smith
111 Center Street, Suite 2200
Little Rock, AR  72202
(Arkansas Bar 77128)
Phone: 501-372-0800
Facsimile: 501-372-6453


/s/James E. Smith
James E. Smith
jsmith@williamsanderson.com