# UNITED STATES BANKRUPTCY COURT

## FOR THE WESTERN DISTRICT OF ARKANSAS

## FAYETTEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Jointly Administered Under** |
| **VEG LIQUIDATION, INC. and** | ) | **Case No. 5:13-bk-73597-BTB** |
| **ALL VEG, LLC,** | ) | |
| | ) | |
| Debtors. | ) | **Chapter 7** |
| _____ | ) | |
| | ) | |
| **R. RAY FULMER, II, CHAPTER 7 TRUSTEE** | ) | |
| | ) | **A.P. No. 5:16-ap-07017-BTB** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **FIFTH THIRD EQUIPMENT FINANCE** | ) | |
| **COMPANY; RYDER INTEGRATED** | ) | |
| **LOGISTICS, INC.; INTERNATIONAL PAPER** | ) | |
| **COMPANY; URS REAL ESTATE, L.P; BALL** | ) | |
| **METAL FOOD CONTAINER** | ) | |
| **CORPORATION; CROWN CORK & SEAL** | ) | |
| **USA, INC.; SYNGENTA SEEDS, INC.; TENEO** | ) | |
| **SECURITIES, LLC; ANDREW TORGOVE;** | ) | |
| **LAZARD MIDDLE MARKET, LLC; LAZARD,** | ) | |
| **FRERES & CO., LLC; ALVAREZ & MARSAL** | ) | |
| **HOLDINGS, LLC; ALVAREZ & MARSAL,** | ) | |
| **NORTH AMERICA, LLC; ALVAREZ &** | ) | |
| **MARSAL PRIVATE EQUITY** | ) | |
| **PERFORMANCE IMPROVEMENT, LLC;** | ) | |
| **JONATHAN HICKMAN; SAGER CREEK** | ) | |
| **VEGETABLE COMPANY F/K/A/ SAGER** | ) | |
| **CREEK ACQUISITION CORP.; 1903** | ) | |
| **ONSHORE FUNDING, LLC; CORTLAND** | ) | |
| **CAPITAL MARKET SERVICES, LLC;** | ) | |
| **SANKATY CREDIT OPPORTUNITIES IV,** | ) | |
| **L.P. (U.S.); SANKATY CREDIT** | ) | |
| **OPPORTUNITIES IV, LP (CAYMANIAN);** | ) | |
| **SANKATY MIDDLE MARKET** | ) | |
| **OPPORTUNITIES FUND, L.P. (US);** | ) | |
| **SANKATY MIDDLE MARKET** | ) | |
| **OPPORTUNITIES FUND, L.P. (CAYMANIAN)** | ) | |

1

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

AND DOES 1-100,                                                )

          **Defendants.**

---

**PLAINTIFF'S CORRECTED AND SUBSTITUTED**
**FIRST-AMENDED ADVERSARY COMPLAINT**
**AGAINST**
**FIFTH THIRD EQUIPMENT FINANCE COMPANY; RYDER INTEGRATED LOGISTICS, INC.; INTERNATIONAL PAPER COMPANY; URS REAL ESTATE, L.P; BALL METAL FOOD CONTAINER CORPORATION; CROWN CORK & SEAL USA, INC.; SYNGENTA SEEDS, INC.; TENEO SECURITIES, LLC; ANDREW TORGOVE, LAZARD MIDDLE MARKET, LLC; LAZARD, FRERES & CO., LLC; ALVAREZ & MARSAL HOLDINGS, LLC; ALVAREZ & MARSAL, NORTH AMERICA, LLC; ALVAREZ & MARSAL PRIVATE EQUITY PERFORMANCE IMPROVEMENT, LLC; JONATHAN HICKMAN; SAGER CREEK VEGETABLE COMPANY F/K/A/ SAGER CREEK ACQUISITION CORP., 1903 ONSHORE FUNDING, LLC; CORTLAND CAPITAL MARKET SERVICES, LLC; SANKATY CREDIT OPPORTUNITIES IV, L.P. (U.S.); SANKATY CREDIT OPPORTUNITIES IV, LP (CAYMANIAN); SANKATY MIDDLE MARKET OPPORTUNITIES FUND, L.P. (US); SANKATY MIDDLE MARKET OPPORTUNITIES FUND, L.P. (CAYMANIAN); AND DOES 1-100.**

COMES NOW R. Ray Fulmer, II, Trustee ("**Plaintiff**"), and for his Adversary Complaint states as follows against:

"Committee Defendants": Ball Metal Food Container Corp.; Crown Cork & Seal USA, Inc.; Fifth Third Equipment Finance Company; International Paper Company; Ryder Integrated Logistics, Inc.; Syngenta Seeds, Inc.; Teneo Securities, LLC; and URS Real Estate, LP; and

"Fiduciary Defendants": Alvarez & Marsal Holdings, LLC; Alvarez & Marsal , North America, LLC; Alvarez & Marsal Private Equity Performance Improvement, LLC; Andrew Torgove; Jonathan Hickman; Lazard Freres & Co., LLC; and Lazard Middle Market, LLC;; and

"Sager Creek," "Sager Creek Defendants," or "Second Lien Holders":1903 Onshore Funding, LLC; Cortland Capital Market Services, LLC; Sager Creek Vegetable Company f/k/a Sager Creek Acquisition Corp.; Sankaty Credit Opportunities IV, L.P. (US); Sankaty Credit Opportunities IV, L.P. (CAYMANIAN); Sankaty Middle Market Opportunities Fund, L.P. (US); Sankaty Middle Market

2

Opportunities Fund, L.P. (CAYMANIAN); and DOES 1-100.

## I.

### <u>JURISDICTION</u>

1. This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

4. The statutory predicates for this action include Federal Rule of Civil Procedure 60(d)(1) and (3), made applicable by Federal Rule of Bankruptcy Procedure 9024, 11 U.S.C. §§ 363(n), 543, 544, 546, 548; 549; 18 U.S.C. §§ 1341, 1343, 1961(1), together with the adopting Bankruptcy Rules common law decided thereon; Arkansas Code §§ 4-59-204, and 4-88-107, together with the common law decided thereon.

## II.

### <u>PARTIES</u>

5. Plaintiff R. Ray Fulmer, II ("Plaintiff") is the Debtors' Chapter 7 Trustee.

6. Defendant Fifth Third Equipment Finance Company ("Fifth") is an Ohio corporation maintaining its principal place of business in Michigan, and was a member of the Official Committee of Unsecured Creditors in the Cases (the "Committee").

7. Defendant Ryder Integrated Logistics, Inc., ("Ryder") is a Delaware Corporation maintaining its principal place of business in Florida, and was a member of the Committee.

8. Defendant International Paper Company ("IP") is a New York corporation maintaining its principal place of business in Tennessee, and was a member of the Committee.

9. Defendant URS Real Estate, LP (URS") is a Delaware corporation maintaining its principal place of business in Georgia, and was a member of the Committee.

10. Defendant Ball Metal Food Container Corp. ("Ball") is a Delaware corporation maintaining its

principal place of business in Colorado, and was a member of the Committee.

11. Defendant Crown Cork & Seal USA, Inc. (Crown) is a Delaware corporation maintaining its principal place of business located in Pennsylvania, and was a member of the Committee.

12. Defendant Syngenta Seeds, Inc., ("SYN") is a Delaware corporation maintaining its principal place of business in Minnesota, and was a member of the Committee.

13. Defendant Teneo Securities, LLC ("Teneo") is a limited liability company, of unknown formation jurisdiction, maintaining its principal place of business in New York, and served as the financial advisor to the Committee.

14. Defendants Fifth, Ryder, IP, URS, Ball, Crown, SYN and Teneo are hereinafter collectively referred to as the "**Committee Defendants.**"

15. Defendant Lazard Middle Market, LLC ("LMM") is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

16. Defendant Lazard Freres & Co., LLC  ("LFC") is a New York limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

17. Defendant Alvarez & Marsal Holdings, LLC ("AMH") is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

18. Defendant Alvarez & Marsal, North America, LLC (A&M) is a Delaware limited liability company maintaining its principal place of business in New York, and served as Debtors' financial advisor.

19. Defendant Alvarez & Marsal Private Equity Performance Improvement, LLC (AMP) is a Delaware limited liability company maintaining its principal place of business in New York and served as and served as Debtors' financial advisor.

20. Defendant Jonathan Hickman ("Hickman") is a managing director of A&M domiciled in North Carolina, and who served as Debtors' Chief Restructuring Officer.

21. Defendant Andrew Torgove ("Torgove") is an individual employed s Managing Director of Defendant LMM, is domiciled in the State of New York, and served as Debtors' financial advisor.

22. Defendants LMM, LFC, AMH, A&M, AMP, Hickman and Torgove are hereinafter collectively referred to as the "**Fiduciary Defendants.**"

23. Defendant Sager Creek Vegetable Company ("Sager Creek") was formerly known as Sager Creek Acquisition Corp. Sager Creek is a Delaware corporation maintaining its principal place of business in Arkansas. Sager Creek was an entity formed by the Second Lien Holders to acquire substantially all of the assets of Veg Liquidation.

24. Defendant 1903 Onshore Funding, LLC ("1903") is a Delaware Limited Liability Company maintaining its principal place of business in Boston, Massachusetts, and held an interest as Second Lien Holder.

25. Defendant Cortland Capital Market Services, LLC ("CORT") is a Delaware limited liability company maintaining its principal place of business in New York, and held an interest as Second Lien Holder.

26. Defendant Sankaty Credit Opportunities IV, L.P. (US) (SankatyUS") is a Delaware limited partnership maintaining its principal place of business in Massachusetts, and held an interest as Second Lien Holder.

27. Defendant Sankaty Credit Opportunities IV, L.P. (CAYMANIAN) ("SankatyCAY") is a Caymanian limited partnership maintaining its principal place of business in Boston, Massachusetts, and upon information and belief, held an interest as Second Lien Holder.

28. Defendant Sankaty Middle Market Opportunities Fund, L.P. (US) ("SMUS") is a Delaware limited partnership maintaining its principal place of business in Massachusetts, and held an interest as Second Lien Holder.

29. Defendant Sankaty Middle Market Opportunities Fund, L.P. (CAYMANIAN) ("SMCAY") is a

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

Caymanian limited partnership maintaining its principal place of business in Massachusetts, and upon information and belief, held an interest as Second Lien Holder.

30. Sager Creek, 1903, CORT, SankatyUS, SankatyCAY, SMUS and SMCAY are hereinafter collectively referred to as "**Sager Creek**" and/or "**Second Lien Holders**."

31. The names and capacities of the DOE defendants are unknown to Plaintiff, who therefore sues them in fictitious name pending discovery of the true names and capacities. Plaintiff is informed and believes and thereon alleges that each of the DOE defendants is legally responsible in some manner for the economic harm to Plaintiff.

32. Plaintiff is informed and believes, and thereon alleges that each Defendant, including DOE Defendants, was the partner, alter-ego, predecessor and/or successor-in-interest (via de facto merger, merger or other business combination), agent, contractor, joint-venturer, employee, co-conspirator, and/or aider and abettor of each of the remaining Defendants.  In committing the acts alleged herein, each Defendant and DOE Defendant was acting within the course and scope of said legal relationship with actual, constructive and apparent authority to do so, and with actual or constructive knowledge and notice of: 1) the bid and contract terms described herein; 2) the customs, practice and usage applied to industry, statutory and/or regulatory terms and procedures in forming such agreements; 3) the implied covenants of good faith and fair dealing among contract parties and auction participants; 4) the intended reliance by the Court, Debtor and Plaintiff on such representations; and 5) the intended reliance by the Court in the subject Cases on the Defendants' good faith fulfillment of duties, including but not limited to the duty of candor,  imposed by the Bankruptcy Rules, Federal Statutory authority, Arkansas regulatory and statutory authority and the common law, as well as those duties specifically imposed by the Arkansas Code of Professional Responsibility, including but not limited to Rules 3.3, 5.3, 5.4 and 8.3.

III.

FACTUAL BACKGROUND

33. Allens, Inc., an 80-year old food canning enterprise, was one of Arkansas' largest family-owned and operated businesses.

34. After financial difficulties beset Allens in 2011, the Allens family leadership hired Fiduciary Defendants LMM and LFC to market the enterprise to prospective purchasers, funding sources and investors. A resulting proposed merger with competitor Seneca Foods failed to close in 2011.

35. In 2012, the family formed All Veg, LLC, which became the 100% owner of Allens, Inc. The enterprise then restructured the company debt, which then included a $130 million Bank of America revolving line of credit and a $35 million secured Bank of America term loan in first position.  In second position stood a $57 million secured loan made by one or more of the Sankaty or Sager Creek Defendants. Each of the three Allens family executives personally pledged a $1,000,000 promissory note as additional security for the loans.  (*Affidavit of Joshua Allen*, Doc#1405-1 at para. 5-7, at pp. 95-96).

36. In January of 2013, the secured lenders insisted that Allens hire Defendant A&M to improve the company's financial performance. One of Allens' can suppliers, Defendant Ball, also amended its supply contract with Allens at that time. *Id.*

37. By July of 2013, the secured lenders applied additional pressure to the Allens family to be irrevocably replaced with A&M designees as the enterprise's executive leadership.  *Id.*

38. Pursuant to a July 19, 2013 A&M agreement, Defendant A&M's executive team took over exclusive control of the enterprise, reporting only to two new directors selected by Defendant A&M. Defendant A&M also wielded the sole power to direct restructuring counsel, Greenberg

Traurig.  The formal Allens, Inc. Board Resolutions ("Resolutions") transferring exclusive power were not executed until August 5, 2013.  The Allens family members were rendered powerless long before that time, and were excluded from meetings between Defendants A&M, the Lazard Defendants, restructuring counsel and apparently Allens, Inc.'s largest unsecured creditor, Defendant Ball. (*Id.*, *Allen Affidavit*, Doc#1405-1 at paras. 9-19, at pp. 95-98).

39.  The August 5, 2013 Board Resolutions reveal that in June and July of 2013, Defendant Ball agreed with the Fiduciary Defendants and the Sager Creek Defendants to participate in the Allens' Inc. restructuring through an eventual "363 sale" under the U.S. Bankruptcy Code. (*Id.*, *Allen Affidavit*, Doc#1405-1, referencing "Ball Corporation," "Restructuring Term Sheet" and "363 Term Sheet" at pp. 104, 108 and 113).

40.  On 7/6/13 and all relevant times thereafter, Defendant Ball was an "issuer" or a "person acting on behalf of an issuer" of securities registered under section 12 of the Securities and Exchange Act of 1934, and was therefore subject to the selective disclosure provisions of Regulation FD (17 C.F.R. Ch. II, Part 243).

41.  Defendant Ball was one of Allen's two can suppliers in July of 2013. Ball would later file a claim in the Cases as a general unsecured trade creditor in the amount of approximately $46.7 million.  Payments to Defendant Ball in the 90 days preceding the filing were accelerated from weekly to daily payments totaling $9.7 million.

42.  Ball's 10Q filing with the U.S. Securities and Exchange Commission for Third Quarter, dated 10/24/13, revealed the following, in pertinent part: "*In the third quarter, the company recorded an accounts receivable provision of $27.0 million ($18.0 million after tax, or $0.12 per diluted share) as a result of the financial difficulties of a customer. This provision represents the company's estimate of the most likely potential loss of value it expects to incur as a result of the financial condition of this customer.*" (Plaintiff incorporates by this reference to the complaint

herein excerpted pages of the subject SEC filing, attached hereto as FAC-EX000039 to FAC-EX000048). Upon information and belief, the customer referenced in the disclosure was the Allens enterprise, Debtor herein.

43. Pre-petition, during the 7/16/13 to 10/24/13 period, Defendant Ball executed an undisclosed agreement with the Second Lien Holders to award Ball a "can and end" supply agreement if the Second Lien Holders' new entity was the successful bidder at the eventual bankruptcy auction of the Allens assets. Defendant Ball was also awarded a $10 million third position note to be executed by the new entity, assumption by the new entity of $4 million of receivables previously due from Allens, as well as a $4.5 million payment to Ball if the new entity was re-sold over a threshold amount in the future.

44. Upon information and belief, Allens' other can vendor, Defendant Crown, was not included in any pre- or post-petition negotiations with any of Allens' potential auction bidders.  Further, upon information and belief, Defendant Ball did not pursue a pre-petition equity and loan agreement with any potential qualified bidder other than the Sager Creek Defendants.

45. Upon information and belief, at the time that Defendant Ball entered the pre-petition agreement with the Second Lien Holders, the terms of the agreement were disclosed to the Sager Creek Defendants and the Fiduciary Defendants. At the time of such pre-petition disclosure, the Sager Creek Defendants and the Fiduciary Defendants, together with their affiliated entities and managing directors, were investment advisors, investment companies and/or responsible parties of activist hedge funds. Upon information and belief, Defendant Ball did not promptly (within 24 hours) file with the SEC a disclosure of the material debt or equity facility agreement it had reached with the Second Lien Holders pursuant to SEC Regulation FD.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

46. Allens, Inc. filed for Chapter 11 protection on October 28, 2013[1], a mere four days after Ball filed its 3rd Quarter 10Q (See paragraph 42, supra). Ball would become a member of the Official Unsecured Creditor's Committee in the Cases a few days later. Of the 20 largest unsecured creditors, Debtors owed Defendant Ball more than $46 million; Defendant Crown (2nd canning vendor) more than $18 million; and Defendant Ryder (transportation) nearly $8 million. (Doc #3).

47. On 11/22/13 Debtors filed a motion to sell Debtors' assets pursuant to section 363 of the Bankruptcy Code to Seneca Foods; to approve Seneca Foods' Asset Purchase Agreement ("APA") as the Stalking Horse Bid, and for related relief.  ("**Motion to Sell**") (Doc #229).

48. At the January 6, 2014 motion to sell hearing, Defendant LMM's Torgove offered positive testimony concerning the Motion to Sell (Doc #585)[2]. Defendant Torgove testified that Seneca's unadjusted $148 million Stalking Horse Bid reportedly left $32.9 million in real and personal property in the Debtors' estate. (Doc #585 at pp. 9-14). Seneca's APA avoided liquidation and would permit Allens' many Arkansas employees to remain employed. (Doc#585 at pp. 50-61, 80).  Review of the Seneca APA also reveals that the $74 million in avoidance actions likewise remained assets of the estate.

49. Torgove's testimony also referenced pre-petition negotiations with the Second Lien Holders and a pre-petition term sheet dated July 16th 2013, but Torgove elected not to disclose Defendant Ball's involvement in that negotiation. (Doc#585 at pp. 71-73)  The Court eventually approved Seneca's APA as the Stalking Horse Bid over the Second Lien Holders' objections concerning the impact of the requested bid protections on their potential credit bid.

50. In 2013, Seneca achieved $1.27 billion in sales. Seneca manufactured more than a billion cans

---

[1] The coordinated bankruptcy matter is captioned Veg Liquidation, Inc. (f/k/a Allens, Inc.) and All Veg, LLC (collectively, "**Debtors**"), pending under joint case number 5:13-bk- 73597 (BTB) (the "**Cases**").

[2] The transcript from the January 6, 2013 hearing was not filed until February 10, 2014, shortly in advance of the sale approval hearing.

and packaging for itself and others, including customer General Mills and its Green Giant brand. Seneca's in-house logistics network handled three national fleets of trucks, 10 million warehouse feet, and a rail network moving up to 2000 railcars per year. Seneca's vertically-integrated operation obviated the need for vendors such as Ball, Crown and Ryder.

51. Debtors' Statements and Schedules (Doc #'s 355-358) revealed DIP lender Bank of America's First Lien of $100 million (Doc #361 at p. 16); Bain Capital affiliates' and others[3] Second Lien of $65 million (Doc #361 at p. 17, Doc #579 at pp. 1-2), and unsecured debt of $108 million (Doc# 361 pp. 56-264).

52. Non-insider avoidable transfers totaled $74,181,615.46. (Doc # 362 pp. 53-135). The Committee Defendants received $18,956,507.30 of that amount, with ninety-two and ½ percent (92.5%) transferred to Defendants Ball, Crown and Ryder.

53. If Seneca won the auction, Defendants Ball, Crown and Ryder would lose the Allens account to Seneca's in-house capacity; would have little or no recourse on $72 million in uncollectible receivables; and would face potential disgorgement of up to $18 million in avoidable transfers.

54. For the Second Lien Holders (Sager Creek Defendants), a Seneca win would relegate approximately $30 million of their undersecured claim to unsecured creditor status.

55. Two days after the motion to sell hearing, on January 8, 2014, James Athanasoulas, Managing Director of Middle Market at Defendant Sankaty Advisors, LLC[4] formed HICO Holdings, LLC in Delaware. On that same date, he formed Defendant Sager Creek Vegetable Company, a Delaware Corporation. HICO became the 100% shareholder of Defendant Sager Creek. The directors of HICO and Sager Creek included Mr. Athanasoulas and other Managing Directors

---

[3] 1903 Onshore Funding, LLC, Cortland Capital Market Services LLC, Sankaty Credit Opportunities IV, L.P., Sankaty Middle Market Opportunities Fund, L.P.

[4] As of the filing of the present First Amended Complaint, Sankaty Advisors, LLC underwent either a name change or a business combination to be currently known as Bain Capital Credit ("BCC"). BCC's Doe Amendment will follow the filing of this First Amended Complaint.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

at Defendant Sankaty as well as representative of other Second Lien Holders, such as Gordon Brothers. Defendant Sager Creek would become the eventual bidder at the Allens auction to assert the Second Lien Holders' bid.

56. On January 24, 2014, Defendant Ball executed an undisclosed agreement to fund Defendant Sager Creek with $2,500,000.00.[5]

57. On or before January 27, 2014, Defendant Sager Creek and McCall Farms submitted timely qualifying bids to compete with Seneca at the auction.  The Committee Defendants and Defendant Ball, as potential bidders, did not submit a qualifying bid.

58. Like the Court-approved Seneca APA, Defendant Sager Creek's qualifying bid left Debtor's $74 million in non-insider avoidance claims in the Debtor's estate. (Doc #1321 at pp. 128- 129, *Cross-Examination of Rutsky*).  However, *unlike* Seneca's bid, Sager Creek's bid included almost all of Debtors' hard and intangible assets.

59. The auction opened on February 3, 2014. Mark Weinsten of FTI Consulting attended the auction as Sager Creek's financial advisor. At auction the First Lien stood at $80,000,000, and the Second Lien at $65,000,000.

60. Defendant Torgove adjusted Seneca's $148 million bid to approximately $117 million in net benefit to the Debtors' estate.[6] (Doc#587, p. 8/20:4-5). McCall then bid to net $119.2 million. (Id. at p. 14/42:15).

61. Defendant Torgove valued Defendant Sager Creek's opening bid at net $160 million. Sager Creek admitted on the record to reaching a side-agreement with Defendant Ryder. (*Id*. at pp. 10/29:7-13). The record does not reflect that Sager Creek or anyone else disclosed Ball's $14-

---

[5] There is a mere reference to this transaction in an incomplete, multi-exhibit package filed at 9:13 p.m. on Monday, February 10, 2014, the night before the scheduled sale approval hearing.  The actual Ball Commitment letter was not attached, nor was the schedule of investment participation in Sager Creek parent, HICO Holdings, LLC.

[6] The adjustments were stated to account for various working capital changes through a 2/15/14.

16.5 million participation in the bid of the Sager Creek Defendants.

62. Significantly, however, Sager Creek *did* change its bid at the 363 auction to include the transfer to Sager Creek of all $74 million of non-insider avoidance actions (preferences) as an asset. (*Id.* at p. 11/33:3-7). The auctioneer then re-confirmed the $160 million in net benefit on the record. (*Id.* at p. 13/36:12).  The avoidance claims were therefore to be acquired by Sager Creek for no apparent additional consideration.[7]

63. Upon information and belief from a witness present at the auction, after Sager Creek changed its offer to include the avoidance claims, the Committee Defendants' visited caucusing bidder representatives before the next round and told them that further bids *had to* include the transfer of all $74 million in non-insider avoidance claims, along with a covenant not to pursue them.

64. After being faced with that bid requirement, Seneca elected not to bid further. (Id. at p. 14/45:13-15). After bidding closed, Committee counsel Ms. Hershcopf stated the following, in pertinent part: **"With respect to McCall, we'd like them to confirm that they're purchasing the preferences [avoidance actions] and not pursuing them…."** . (Id. at p. 15/47:4-6).

65. Ms. Hershcopf then stated, in pertinent part: **"….and the second issue I'm happy to talk with you about separately, but you might have already heard that when the second lien was bidding that they agreed to…..buy the [sic] preference actions other than the insider actions, and agreed not to pursue them. That's an important thing to the committee. We're happy to discuss that with you separately." "How about this: I actually think that what we should do is deal with that in the documentation.  I think, Brian, you are not going to care."** (*Id.* at p. 15/47:20-24, & 48:1-13).

66. McCall Farms' agreed to the Committee Defendants' unauthorized bid requirement. (*Id.* at

---

[7] By the time the Sager Creek APA was filed on 2/7/14, the purchase price had changed to $124,781,000. (Doc#563-1 at p. 18).

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

48:14-15).[8]  The auctioneer closed the bidding at just before 8:00 p.m. E.S.T. on February 3, 2014.  (*Id*. at p. 49:2-5).

67. By the formal close of the auction on February 6th, no person declared on the record that the bidding process did not fall under the influence of collusive bidding, non-arms-length negotiating, or adverse domination by any person or entity.

68. The Committee Defendants' unauthorized bid requirement achieved the desired effect and Sager Creek was deemed the Successful Bidder. Defendants Ball, Crown and Ryder were spared up to $18 million by the transfer of all $74 million in avoidance claims to Sager Creek for no additional consideration.

69. The record does not reflect that the Fiduciary Defendants, Teneo or any other advisor at the auction reconciled the "net benefit" of the Sager Creek bid against the additional hard assets and $74 million of avoidance actions stripped from the Debtors' estate for no apparent additional consideration.

70. Likewise, the auction transcript does not reflect that anyone comparatively scored the bids. There was no reconciliation of how Sager Creeks' bid remained at net $160 million both before and after the $74 million in avoidance actions were included as sale assets.

71. Long after the auction closed, in fact, the Sager Creek net APA reflected a purchase price of just under $125 million, not $160 million.

72. The day after the auction closed, Friday, February 7, 2014, James Athanasoulas executed an extensive, obviously pre-prepared, Arkansas Department of Environmental Quality (ADEQ) Disclosure Statement to effect a transfer of air and water environmental permits for the main Allens plant in Siloam Springs.  Mr. Athanasoulas identified the new Allens facility owner as Sager Creek Acquisition Corporation.  Mr. Athanasoulas disclosed HICO Holdings' 100%

---

8 McCall Farms later modified its APA to include the transfer of all non-insider avoidance or preference actions for no additional value, together with a covenant not to pursue them.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

stock interest in Sager Creek to ADEQ, but elected not make the required disclosure identifying Defendant Ball as a holder of 5% or more of the value of the company in debt or equity.

73. On Friday, February 7, 2014, Debtors filed a 362-page document set containing Sager Creek's and McCall Farms' modified APA's (155 pages and 198 pages respectively). (Doc #563). Debtor filed an amended proposed order on February 9, 2014. (Doc# 583).

74. On Sunday, February 9, 2014, Sager Creek filed the *Declaration of Mark Weinsten in Support of Adequate Assurance of Future Performance on Assigned Contracts and Leases*. (Doc #579). Therein, Mr. Weinsten declared under penalty of perjury that Sager Creek was to obtain an $80 million revolving credit line; a $32 million term loan; $25.7 million in funding from "Sankaty affiliates;" and *$2.5 million in funding from a major supplier of the company*. (*Id*. at p. 4, paras. 10, 11) (emphasis added).  Mr. Weinsten elected not to disclose the name of Defendant Ball, Ball's $14 million third position note from Sager Creek, or Ball's $4.5 million resale bonus provision either in the Declaration, or before or at the subsequent hearing before this Court.

75. At the auction, Sager Creek credit bid the secured portion of the Second Lien debt, part of which was apparently "swapped" with a list of hedge funds run by Sankaty Advisors, LLC.

76. The Court held a hearing to approve the sale on February 11, 2014.  The hearing exhibits filed the night before were not introduced into evidence.  At no point did anyone explain to the Court how Sager Creek received $106.9 million more in Debtor's assets for $8 million more than was bid by Seneca, or that the $8 million overbid was illusory in that it was created by economic artifice.

77. Committee Defendant Ball's pre- and post-petition funding agreements with the Sager Creek Defendants were never disclosed to the Court. The Court was not told that Ball's $14-16.5 million investment interest in Sager Creek could provide Ball with a multi-million dollar bonus upon resale of Sager Creek. The Court was not told at the hearing that the supplier providing

$2.5 million in future funding to Sager Creek was actually Committee member Defendant Ball. Upon information and belief, Committee counsel attended the hearing, but did not enter an appearance.

78. The Court also was not informed that the Sager Creek APA terms had materially changed from those in Seneca's APA approved merely a month before. The Court was not told at the hearing that Debtors' $74 million of avoidance claims were be transferred to Sager Creek for no value, with a covenant not to pursue them; or that the Committee's unauthorized bid contingency at the auction caused the avoidance claim transfer to become a required APA term.

79. Not a single bid was scored and reconciled during the hearing for the Court. No recipient of the presumed preferential transfers timely sought a declaratory judgment establishing that any transfer was not a preference.

80. Candid disclosure by the Defendants would have rendered the auction and sale incapable of court approval as being subject to agreements to control the price of the assets. The absence of the material and candid disclosures by the Defendants not only reduced the value received by the estate of the assets sold, but likewise constituted a fraud on the Court under applicable bankruptcy and Arkansas state law. As a direct result of the collusive and fraudulent conduct of the Defendants, and the concealment of material pre- and post-petition agreements among bidders to control the price realized at the subject auction, the Court approved the sale of assets at substantially lower value than would have been afforded the estate by the approval of the Seneca bid and APA.

81. On February 14, 2014, Defendant Ball filed a $47.7 million dollar unsecured trade claim against the Debtor's estate. (Claim 113-1).

82. On February 24, 2014, Defendant Ball filed its 2013 annual report (10K) with the SEC, partially disclosing the 2013 agreement with the Second Lien Holders: "*In October 2013, the*

*company entered into an agreement with the customer's second lien lenders to provide, among other things, that if such lenders were the successful bidder for the customer's assets out of bankruptcy, the company would supply the lenders' can and end requirements under a new long-term contract. On February 6, 2014, the lenders were selected as the successful bidder for the customer's assets and such selection was approved by the U.S. Bankruptcy Court on February 12, 2014. No change in the company's valuation is currently considered necessary; however, if certain facts and circumstances change as a result of future events, the potential loss may materially change.*" (Plaintiff incorporates by this reference to the complaint herein excerpted pages of the subject SEC filing, attached hereto as FAC-EX000052 to FAC-EX000056).

83. Defendant Ball's 2013 10K disclosure materially omitted: 1) Ball's agreement to invest $10 to $14 million in Sager Creek Vegetable Company; 2) Ball's agreement to have $4 million in receivables from Allens assumed by Sager Creek Vegetable Company; 3) Ball's agreement to invest another $2.5 million in Sager Creek per Mark Weinsten; and 4) Ball's $4.5 million conditional bonus payment upon resale of Sager Creek.  The disclosure also characterized the supply agreement with Sager Creek Vegetable Company as a new supply contract instead of a supply agreement "assumed" from Allens.

84. The sale to Sager Creek closed on February 28, 2014. (Doc#824, p. 2) The name of the entity was changed that same day from Sager Creek Acquisition Corporation to Sager Creek Vegetable Company.

85. On February 28, 2014, pursuant to Defendant Ball's pre- and post-petition agreements with the Sankaty Defendants, Defendant Ball entered a previously undisclosed "Subordinated Loan Agreement" with Defendant Sager Creek Vegetable Company in the amount of $14,000,000.00.  Upon information and belief, Defendant Ball did not make a quarterly or

annual filing disclosure of its $14,000,000.00 investment in Sager Creek. (Plaintiff incorporates by this reference to the complaint herein excerpted pages of the subject SEC filing, attached hereto as FAC-EX000039 to FAC-EX000075, FAC-EX000097-106). Defendant Ball likewise actively concealed the agreement from the Court after the sale approval order was entered.

86. On April 18, 2014, Defendant Ball caused a Delaware limited liability company to be formed, bearing the name "Ball Metal Food Container, LLC."

87. On May 1, 2014, Defendant Ball filed its 8K quarterly report, where Ball admitted, as follows: "*The allowance for doubtful accounts at December 31, 2013, included a provision of $27.0 million as a result of the October 2013 bankruptcy filing of a metal food and household products packaging segment customer. On February 6, 2014, the customer's second lien lenders (lenders) were selected as the successful bidder for the customer's assets and such selection was approved by the U.S. Bankruptcy Court on February 12, 2014. The lenders acquired the customer's assets on February 28, 2014, and as a result, the company fully wrote off the accounts receivable reserved for at December 31, 2013. The company also recorded various short-term and long-term receivables in conjunction with the lenders' acquisition*."

88. Absent from the May 1, 2014 filing was a disclosure of Defendant Ball's investment of $14-16.5 million, as well as Ball's resale bonus provision.

89. Sager Creek's name was apparently later changed to Allens, Inc. and then back to Sager Creek Vegetable Company in June of 2014. (Plaintiff incorporates by this reference to the complaint herein excerpted pages of Defendant Sager Creek's July 2014 Arkansas Department of Environmental Quality (ADEQ), attached hereto as FAC-EX000032 to FAC-EX000038).

90. In June of 2014, Sager Creek's Chief Executive Officer, Chris Kiser, submitted an application to amend Sager Creek's Certificate of Authority in Arkansas to reflect the new name. The Amendment contained a valuation of the company assets, which according to CEO Kiser was

approximately $95.2 million. (Plaintiff incorporates by this reference to the complaint herein excerpted page of the subject ADEQ filing, attached hereto as FAC-EX000033).

91. For their part, the Sager Creek Defendants helped conceal the debt or equity deal with Defendant Ball during the Rule 60(b) limitations period. The Sager Creek Defendants' June 2014 ADEQ disclosure statement (like the February, 2014 statement) did not include the required disclosure of Defendant Ball as the holder of a debt or equity position of 5% or more. (Plaintiff incorporates by this reference to the complaint herein excerpted pages of the subject ADEQ filing, attached hereto as FAC-EX000001 to FAC-EX000038, at pp. 000004, 000010, and 000027).

92. On February 19, 2015, after the Rule 60(b) limitations period had run, Ball filed with the SEC a 606-page document detailing its U.K. subsidiary's purchase offer for a company named "Rexam." Included in that purchase offer, on page 386 of the filing, was sub-schedule 8.7 entitled "Existing Investments." Under that heading, Defendant Ball reported: ***"Ball Metal Food Container, LLC, has a loan to Sager Creek Vegetable Company for an original principle amount of $14,000,000 under the Subordinated Term Loan Agreement dated February 28, 2014.***" (Plaintiff incorporates by this reference to the complaint herein excerpted pages of the subject SEC filing, attached hereto as FAC-EX000076 to FAC-EX000082, at pp. 000079 and 000082). Ball Metal Food Container, LLC is a Delaware limited liability company and wholly-owned subsidiary of Defendant Ball. Id. at p. FAC-EX000105. The disclosure did not reveal Ball's, or the subsidiary's, $4.5 million resale bonus provision.

93. Notwithstanding the further assurances of Mr. Weinsten, Sager Creek failed within a year of the auction. Del Monte purchased Sager Creek's assets for a mere $75 million in March of 2015.

94. Neither Defendant Ball, nor the Sager Creek Defendants, ever disclosed to the Court its pre-

and post-petition lending, investment and resale bonus agreements with Sankaty and/or the Sager Creek Defendants.  In addition, upon information and belief, neither Defendant Ball, nor the Committee made such disclosure to their constituent unsecured creditors in compliance with BAPCPA section 1102(B)(3).

95. At the very Rule 363 auction where Defendant Ball would vote as a Committee member to consent to the Sager Creek Defendants' offer, Defendant Ball also served as an undisclosed contractual partner and prospective equity holder of bidder Defendant Sager Creek. That same Committee insisted that all bidders match the bid of Sager Creek to include the transfer to the Sager Creek Defendants of all non-insider avoidance actions and $32.9 million of real estate, for no additional consideration or inadequate consideration.

96. On 6/6/15, the Court converted the Cases to Chapter 7, and appointed Plaintiff R. Ray Fulmer, II as Trustee.  (Docs#971, 976).  Defendant Sager Creek refused Plaintiff's timely demand to disgorge the avoidance actions.

97. The claims of unsecured creditors whom were not Committee members; whom did not agree to invest in Sager Creek after the Closing; or whose contracts were not assumed, remained unpaid.

98. Due to Defendants' concealment of their adverse domination of, interference with, collusion concerning the auction, and subsequent fraud on the court, Defendants breached their legal duties to the Court, to the constituent unsecured creditors and to the Debtors' estate.

99. In doing so, the Defendants engaged in a fraudulent transfer which divested the estate of no less than $74 million in avoidance actions, and up to $32.9 million of real and personal property.

100.    Defendant Ball owed fiduciary duties, as well as a duty to disclose its pre- and post-petition loan, equity and bonus agreements with the Sager Creek Defendants to the Court, to the Committee, to the unsecured creditors, to the SEC and to the ADEQ before, during and after the applicable 60(b) limitations period.

101.    Defendants unlawfully conspired, aided & abetted and otherwise furthered their concealment and conspiracy through fraud on the court, the use of the mails of the United States, wire facilities and/or the Internet. Each Defendant engaged in, at best, a lack of candor with the Court in order to prevent, hinder and/or delay timely detection of the fraudulent transfer and conversion of estate assets.

102.    Defendants collectively owe the estate $74 million in un-rebutted avoidance actions, all other value wrongfully denied to the estate, unjust enrichment or savings secured by their collusion and conspiracy, treble and exemplary damages, interest at the legal rate from February 28, 2014 to the date of judgment, along with attorney's fees and costs.

**IV.**

**<u>FIRST CLAIM</u>**

**BREACH OF FIDUCIARY DUTY**

(As against the Fiduciary Defendants)

103.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 102.

104.    Debtors employed the Fiduciary Defendants as expert financial advisors. Defendants ASH, A&M and AMP assigned Hickman as Debtors' Chief Restructuring Officer ("CRO"). Defendant LMM assigned Defendant Torgove as Debtors' financial advisor.

105.    The Fiduciary Defendants owed Debtors a fiduciary duty.

106.    The Fiduciary Defendants breached fiduciary duties owed to Debtor by:

    a.  Consenting to an unauthorized bid requirement, to wit, that Debtors' non-insider avoidance claims transfer to the Successful Bidder for no additional consideration, contingent on a covenant not to pursue the claims;

    b.  Concealing Defendant Ball's pre- and post-petition agreements to fund and invest in a bidder at the Allens 363 auction;

21

    c.  Acquiescing to the adverse domination of the auction by the Sager Creek and Committee Defendants, who imposed the unauthorized bid requirement;

    d.  Negligently failing to comparatively reconcile the respective bids, thereby relegating Seneca's bid to that of least net value, when it was the bid providing the most net value;

    e.  Executing the post-petition fraudulent transfer of Debtor's assets by transferring substantially more assets than provided in the Seneca APA for substantially less comparative value;

    f.  Providing material assistance to those with interests in conflict with Debtors' interests, at Debtor's expense, while aiding and abetting a conspiracy to convert Debtors' assets;

    g.  Concealing Defendants' conspiracy, collusion and adverse domination from the Debtor and the Court, and likewise concealing the terms of Defendant Ball's participation and collusion with the Sager Creek Defendants;

    h.  Failing to suspend or re-open the auction to mitigate Debtors' economic harm;

    i.  Failing to timely notify Debtors of the conflict of interest created by the conduct set forth above; failing to withdraw as a fiduciary; failing to disgorge fees; and failing to timely instruct Debtors to obtain new advisors to mitigate their damages;

    j.  Deepening Debtor's insolvency through the acts, or failures to act, as set forth above.

107.    The Fiduciary Defendants' pre- and post-petition conduct constituted misconduct, a breach of contract and fiduciary duty, a breach of heightened duty, and negligence.

108.    The Fiduciary Defendants' pre-conversion conduct caused, or was a substantial factor in causing economic harm to the Debtors in the form of a lower auction price.

109.    The Fiduciary Defendants acquiesced to the adverse domination, collusion and conspiracy, and sacrificed the interest of the Debtors' estate, in order to instead protect their own financial interests and those of the First and Second Lien Holders and the Committee Defendants whom

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

would collectively lose more than $118 million if Seneca's bid were accepted.

110.    The object of the adverse domination, collusion and conspiracy was unlawful, in that it took place through: a) the promise of Defendant Ball to pay Sager Creek Acquisition Corp $2.5 million and to receive from Sager Creek a $14 million note (with a $4.5 million bonus provision) to secure payment of pre-petition receivables; b) the fraudulent transfer from the Debtors' estate of $32.9 million in Real Estate and $74 million in actionable avoidance claims in order to prevent Debtors and the Trustee from recovering up to $18 million of preference payments to Defendants Ball, Crown and Ryder; c) Re-engaging one or more Committee Defendants as a vendor(s) to Sager Creek as consideration for participation in the conspiracy; d) engaging in unfair business practices and unfair competition through collusive bidding against competitor Seneca; and e) concealment of the unlawful conduct from the Court and Plaintiff.

111.    Defendants' unlawful conduct renders the Court's order approving the sale to be non-preclusive of the remedies sought by Plaintiffs herein pursuant to Federal Rule 60(b)(3), in that Plaintiffs seek damages for the conduct, and do not seek to overturn the sale of the assets.  The adverse domination of the auction, and the adverse interest held by the Fiduciary Defendants affords standing to Plaintiff Trustee Ray Fulmer, II as the Real Party in Interest to seek the relief set forth herein pursuant to 11 U.S.C. sections 543, 544, and or 546.

112.    In negligence, the Fiduciary Defendants breached their duty of care to the Debtors by negligently failing to timely disclose to Debtors' and the Plaintiff the adverse domination and unlawful conduct of the Sager Creek Defendants and the Committee Defendants; or otherwise taking timely action to invalidate or re-open the auction to mitigate Debtors' loss.

113.    The Fiduciary Defendants' breach of duty was the actual cause, or was a substantial factor in causing, financial harm to the Debtors and to the Debtors' estate.

**V.**

## SECOND CLAIM

### FRAUDULENT TRANSFER

(As against all Defendants)

114.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 113.

115.     The Defendants conspired to transfer real and intangible property (including more than $74 million in non-insider avoidance claims) from the Debtors estate to the Sager Creek Defendants for no consideration, or inadequate consideration.

116.     The Court-approved Seneca APA did not permit transfer of non-insider avoidance claims. The Defendants buried the avoidance claim transfer in hundreds of pages of Sager Creek and McCall Farms APA's filed and made available a business day before the 2/12/14 hearing.  No filing candidly alerted Court to the material changes from the previously-approved Seneca APA, or contained a comparative reconciliation of the assets to be transferred with valuations.  The Defendants never candidly told the Court at the hearing that the Sager Creek and McCall APA's materially differed from the Court-approved Seneca APA.  Per the Sager Creek APA, an asset reconciliation and schedule, complete with line-item valuation computations, was to be delivered to Sager Creek within 5 days of the Closing.  No draft schedule was provided to the Court.

117.     The Defendants likewise did not file the final closing sale documents with the Court, or disclose Defendant Ball's collusion with the Sager Creek Defendants.

118.     The transfer not only removed valuable assets from the Debtors' estate for no consideration, but also thwarted future attempts to prosecute the avoidance actions by rendering the claims valueless.

119.     The Defendants formed and concealed the conspiracy in order to: a) permit the Committee Defendants to compete unlawfully with Seneca Foods in the canning, packaging and transportation industries; b) spare the Committee Defendants the burden of nearly $18 million in

avoidance claims; c) reward the Committee Defendants with continued vendor status as *quid pro quo* for their adverse domination of the auction; d) permit Sager Creek to falsely outbid Seneca, through the application of economic artifice, and take title to substantially all the assets of the Debtor for a substantially-lower net value than that offered by Seneca; e) spare the Sager Creek Defendants the relegation of their Second Lien to unsecured debt status; f) permit the Sager Creek Defendants to swap their unsecured loan to Debtors with a secured loan from a Sankaty affiliate; and g) permit Sager Creek to obtain $2.5 million in cash and a $14 million loan from Defendant Ball; and h) permit Defendant Ball to recover millions of dollars of its unsecured claim in the absence of an executory contract.

120.      Defendants' conduct and lack of candor constitutes a fraud on the Court.

121.      The transfer of the avoidance actions and all other assets for no consideration or inadequate consideration is a post-petition fraudulent conveyance (as defined by 11 U.S.C sections 548 and 549, and section 4-59-204 of the Arkansas Code), in that the transfer was obtained through a fraud on the Court; in return for no consideration or reasonably equivalent value; with the actual intent to hinder, delay or defraud creditors; and to convert the assets of the Debtors' estate for the sole benefit of the Defendants.

122.      Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

123.      Defendants' conduct was the actual cause of economic loss to the Debtors' estate and the

unsecured creditors, in an amount according to proof.

124.       Defendants' adverse domination and conspiracy to conceal unlawful conduct render any

order approving the subject sale to have been procured by Defendants' fraud, and therefore non-

preclusive of the remedies sought by Plaintiffs herein.  Such adverse domination likewise affords

standing to Plaintiff to seek the remedies set forth below pursuant to 11 U.S.C. section 544, and or

546.

**VI.**

**<u>THIRD CLAIM</u>**

**CONSPIRACY TO COMMIT FRAUD ON THE COURT**

(As against all Defendants)

125.       Plaintiff incorporates by reference the allegations in paragraphs 1 through 124.

126.       11 U.S.C. section 363(n), together with Arkansas statutory and common law, prohibit

fraud, fraud on the court, collusion, adverse domination or undue influence from being exerted

over or concerning auction proceedings.

127.       The Committee Defendants, and Defendant Ball if considered individually, held more than

$70 million of unsecured debt, and were potential bidders for purposes of 11 USC section 363(n).

128.       The Debtors auctioned their assets on February 3, 2014.

129.       If Seneca won the auction, much of the $65,000,000 Second Lien would become

unsecured. However, if the Sager Creek Defendants became the Successful Bidder, the Second

Lien Holders (whom formed and owned Sager Creek Acquisition Corp for purposes of the

auction) would have the opportunity to swap their under-secured debt with a Sankaty affiliate,

which would then obtain a fully-secured note from Sager Creek Acquisition Corp.

130.       The Sager Creek Defendants used the secured amount of their Second Lien as a credit bid

in order to over-bid Seneca's $117 million bid.

131.    In the second round caucus session, after the Sager Creek Defendants announced that they would take all avoidance action assets from the Debtors' estate, the Committee Defendants told bidders off the record that their bids must contain the same or similar transfer provision, with a covenant not to pursue the claims. The implication from the context of the remark was that non-compliant bids would either not be accepted, or would be the subject of an objection by the Committee. This unauthorized bid requirement would save the Committee Defendants almost $18 million in avoidance claims.

132.    The record disclosed that Ryder was to be re-engaged by Sager Creek as a vendor.  The record reveals no disclosure that Defendant Ball was to recover up to $14 million of its unsecured general trade claim from Sager Creek after the Closing, or alternatively, that Defendant Ball would fund or lend $14-16.5 million to Sager Creek if Sager Creek won the Allens auction.

133.    The auction participants did not state on the record after bidding closed, or during the 2/12/14 Motion to Sell hearing, that the bids did not result from fraud, collusion, adverse domination or undue influence.

134.    Bank of America, the First Lien Holder and DIP financing entity, along with the Sager Creek Defendants, applied intense pressure on the Allen Family executives to yield all control over the Debtors to Defendant A&M, and continue to retain the Fiduciary Defendants, with whom Bank of America had worked on several other bankruptcies. Bank of America expected the Fiduciary Defendants to successfully auction Debtors' assets and get the First Lien paid.  The timing of the bankruptcy was no accident, but rather was a calculated and pre-packaged auction scheme orchestrated by A&M to create temporal urgency at the expense of notice and disclosure. The auction was held on the eve of the grower-contracting season.  For Bank of America's part, they set the DIP financing expiration a week after the auction. (Doc#585, p. 26). The argument to the Court was that if the auction were unsuccessful, or had to be delayed, the reorganization would

likely fail.

135.    Accordingly, when the Committee Defendants' imposed their unauthorized bid

requirement during the auction, the Fiduciary defendants were faced with an immediate conflict of

interest of whether to suspend the auction due to the collusion and misconduct, or let the Debtor

be stripped of more than $100 million in assets for expediency.

136.    The Fiduciary Defendants controlled all material aspects of the Debtors' financial affairs,

however, the Committee Defendants held implicit leverage over the auction.  A litigated

Committee objection on the eve of the grower contract period and the looming DIP expiration

would cause a delay that all parties argued would be fatal to the Debtors' reorganization.

137.    Moreover, a litigated objection would delay payment to the Fiduciary Defendants' frequent

business associate, Bank of America. If the Fiduciary Defendants suspended the auction, reported

the adverse domination to the Court, and sought to re-open the bidding, similar consequences

would result.

138.    The only option that did not seemingly risk Debtors' destruction and invoke the ire of

Bank of America was to acquiesce to the Committee's and Sager Creek's conspiracy to impose the

unlawful bid requirement.

139.    With the success of the auction hanging in the balance, the Fiduciary Defendants had every

improper reason to incorrectly, mistakenly, negligently or intentionally over-value the Sager Creek

bid by failing to comparatively reconcile all bids against the assets left in the estate.

140.    The Defendants remain in exclusive control of the bid valuation notes, documents and

dated spreadsheets, along with applicable metadata on the native documents.  The acquired asset

closing schedules required by the APA's to be generated at and before the Closing do not appear

on the Case docket.  However, the available data correlated from the auction transcript, the APA's

and the Statements & Schedules, permit Plaintiff to conclude that the Sager Creek bid could not

have topped the Seneca bid in the absence of miscalculation, unsupported financial assumptions or employment of economic artifice by the Fiduciary Defendants.

141.     According to available documents, Sager Creek agreed to pay an illusory $8 million more than the Seneca bid in order to receive $106.9 million in additional assets.

142.     Based upon the auction transcript, the Declaration of Mark Weinsten, and the various iterations of the APA's, Plaintiff can reasonably deduce that, to win the auction, the Sager Creek Defendants purchased the Committee Defendants' participation, and certainly that of Defendant Ball, in the conspiracy with the transfer of the avoidance claims and by promising to engage the controlling Committee Defendants as Sager Creek's new vendors.

143.     From a financial and future business standpoint, Ball, Crown and Ryder needed Seneca to lose the auction to Sager Creek. If Seneca won the auction, its vertical integration of can production, packaging and logistics offered Ball, Crown and Ryder no chance to recover their millions in receivables, and little hope of remaining prime vendors in the future. Since Seneca would not succumb to the Committee's bid requirement concerning the avoidance claims, a Seneca win at the auction meant that Ball, Crown and Ryder would also remain vulnerable to almost $18 million in avoidance claims.

144.     From a similar standpoint, the Sager Creek Defendants also needed Seneca to lose the auction. If Seneca won the auction, almost $30 million of the Second Lien would be relegated to unsecured status and would then stand in line as $32.9 million in property and $74 million in voidance claims were slowly liquidated to satisfy more than $138 million in unsecured creditor debt.  Sager Creek had every reason to agree with the Committee to strip the Debtors' avoidance actions, keep Defendants Ball and Ryder as vendors in return for millions in partial payment of their general unsecured trade claims; and receive $14-16.5 million from Defendant Ball. With the auction win came the crucial ability to swap the under-secured Second Lien with several Sankaty

affiliates, whom would then fully secure the new financing through the Sager Creek entity.

145.     The Defendants actually executed on their scheme to strip Debtors avoidance claims and other assets for no consideration. The Committee Defendants were potential bidders that did not submit a competing bid.  At the opening of the auction, Sager Creek added the avoidance claims to their APA as "included assets" and announced the assumption agreement with Ryder.  Apparently on cue, the Committee then visited bidders in their break-out rooms and imposed the unauthorized bid requirement. At the end of the auction, the Committee expressly revealed the bid requirement, but would never reveal Defendant Ball's pre-petition agreement to receive $14-16.5 million for its assistance, to receive a $4.5 million resale bonus, or that Defendant Ball was so invested in the outcome of the auction in Sager Creek's favor that it could not discharge its fiduciary duty.

146.     For their part, the Fiduciary Defendants and the auctioneer, having knowledge of Defendant Ball's pre- and post-petition agreements with bidder Sager Creek, agreed on the record to the false and illusory $160 million net valuation of the Sager Creek APA.  This permitted Sager Creek to falsely top the Seneca bid.  Seneca wisely did not submit to the unlawful demands of the Committee and refused to bid further.  Sager Creek was declared the Successful Bidder.

147.     Only after the auction closed, at the proverbial eleventh hour, did the heavily-modified155-page Sager Creek APA get revised to reflect only a net $124 million purchase price, with no comparative reconciliation of the transferred avoidance claims.  Near the same time, Sager Creek filed the Declaration of Weinsten detailing a "supplier's" commitment to pay $2.5 million to Sager Creek, and the Second Lien Holders' note swap with a Sankaty affiliate.  Weinsten omitted the $14 million funding from Ball, as well as Ball's $4.5 million resale bonus.

148.     Not a candid word of the scheme was disclosed to the Court at the 2/12/14 sale hearing.  The Committee Defendants did not appear.  The Court was never given reason to ask whether the auction resulted in a material change to the Seneca APA approved a month earlier, i.e. that

avoidance claims had become included assets for no consideration instead of remaining excluded assets to convert to cash for the estate.

149.     By following through on the conspiracy, Defendants committed a fraud on the court, succeeded in transferring substantially all of Debtors' assets to Sager Creek for substantially-less net economic value to the estate than would have been realized had the Seneca APA prevailed.

150.     Defendants knew or had reason to know of the scheme to engage in the fraudulent transfer, and the consideration each participant would receive for agreeing to engage in the unlawful acts. Each Defendant participated in, or acquiesced to, the scheme.  Each Defendant aided and abetted the others in executing on their unlawful scheme.  Each Defendant concealed the scheme and its consequences from the Court.

151.     Through imposition of adverse domination, fraud, fraud on the court and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors. The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

152.     Defendants' conduct was the cause, or was a substantial factor in causing, economic harm to the Debtors' estate, in an amount according to proof, but at a minimum including $32.9 million in hard assets, along with the $74 million in avoidance actions transferred for no value whatsoever.

## VII.

## FOURTH CLAIM

## AIDING AND ABETTING

## CONVERSION AND FRAUD ON THE COURT

### (Plaintiff as Against All Defendants)

153.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 152.

154.     11 U.S.C. section 363(n), and Arkansas statutory and/or common law, prohibit fraud, collusion, adverse domination, non-disclosure and undue influence from being exerted over auction proceedings. The sale price cannot result from an agreement among potential bidders.

155.     The Committee Defendants held $67.56 million of unsecured debt, and were potential bidders for purposes of 11 USC section 363(n).

156.     Defendant Ball was a committed debt or equity investor in Defendant Sager Creek at the time of the bidding, and was therefore a potential bidder for purposes of 11 USC section 363(n).

157.     After the Allens auction, Defendant Sager Creek Acquisition Corp emerged as the Successful Bidder as a result of the adverse domination, collusion, non-disclosure and conspiracy of the Sager Creek Defendants, the Committee Defendants and the Fiduciary Defendants.

158.     Upon information and belief, the Defendants agreed that the Committee would impose a bid requirement at the auction wherein all non-insider avoidance claims must be transferred to the Successful Bidder subject to a covenant not to pursue the claims.  The Committee would inform the bidders that the Committee would not support, and would object to, bids that did not include the transfer of the avoidance actions away from the control of the Debtors' estate.

159.     Using Debtors' assets, undisclosed funding from Defendant Ball, a commitment to secure $14 million in past receivables for Defendant Ball, a commitment to bestow a $4.5 million resale bonus upon Defendant Ball and a commitment to bestow new vendor contracts upon Defendant Ball and Defendant Ryder, the Sager Creek Defendants purchased the participation of the Committee Defendants in the conspiracy.

160.     The Committee's participation in the scheme was purchased with the knowledge and active

assistance of the Fiduciary Defendants.

161.     Defendants actually executed on their scheme to strip Debtors avoidance claims and other assets for no consideration. The Committee did not submit a qualifying bid.  At the opening of the auction, Sager Creek added the avoidance claims to their APA as "included assets" and announced the assumption agreement with Ryder.  On cue, the Committee then visited bidders in their break-out rooms and imposed the unauthorized bid requirement. At the end of the auction, the Committee expressly revealed their bid requirement when it instructed McCall to include the avoidance claims in their APA.

162.     For their part, the Fiduciary Defendants and the auctioneer agreed on the record to the false or incorrect $160 million net valuation of the Sager Creek APA.  This permitted Sager Creek to falsely top the Seneca bid. Seneca wisely did not submit to the unlawful demands of the Committee and refused to bid further.  Sager Creek was declared the Successful Bidder, with McCall Farms as the Successful Back-up Bidder.

163.     Days after the auction ended, on the eve of the hearing to approve the sale at the auction, Sager Creek's heavily-modified155-page APA was submitted to the Court with mere $125 million purchase price, with no comparative reconciliation of the transferred avoidance claims and false and non-arms-length "cure" amounts attributed to the claims of Sager Creek's new investor, Defendant Ball, as well as Defendant Ryder.  Near the same time, Sager Creek filed the Declaration of Weinsten detailing a major vendor's commitment to pay $2.5 million to Sager Creek, and Second Lien Holders' note swap with a Sankaty affiliate.

164.     Not a candid word of the scheme was disclosed to the court at the 2/11/14 sale hearing. The Committee Defendants did not appear.  The Court was never given reason to ask whether the auction resulted in a material change to the Seneca APA approved a month earlier, i.e. that avoidance claims had become included assets for no consideration instead of remaining excluded

assets to convert to cash for the estate.

165.    By following through on the conspiracy, Defendants committed a fraud on the court, and
succeeded in transferring the Debtors' assets to Sager Creek for substantially-less net economic
value to the estate than would have been realized under the Seneca APA.

166.    Each Defendant knew of the scheme to engage in the fraudulent transfer, and knew of the
consideration each participant would receive for agreeing to engage in the unlawful acts. Each
Defendant participated, agreed to participate in the scheme, or acquiesced to the scheme.  Each
Defendant aided and abetted the others in executing on their unlawful scheme.  Each defendant
concealed the scheme and its consequences from the Court.

167.    Through imposition of adverse domination, fraud, and conspiracy to convert Debtors'
assets through the subject auction, the Committee and Sager Creek Defendants intended to induce
a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and
Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to
abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the
execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in
property.

168.    Defendants' conduct was the cause, or was a substantial factor in causing, economic harm
to the Debtors' estate, in an amount according to proof, but at a minimum including $32.9 million
in hard assets, along with the $74 million in avoidance actions transferred for no value
whatsoever.

## VIII.

## FIFTH CLAIM

### CONVERSION

(Plaintiff against All Defendants)

169.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 168.

170.     Debtors owned substantial assets in the form of $32.9 million in real and personal property and more than $74 million non-insider avoidance claims.

171.     Defendants divested Debtors' of the property for no value through a fraudulent transfer resulting from a conspiracy to unlawfully and adversely dominate the Debtor and its auction, and to conceal the scheme from the Court.

172.     Defendants took possession of the subject property in the days and months after February 28, 2014.

173.     Defendants prevented plaintiff from accessing or having use of the property, and refused to return the property after demand.

174.     Due to adverse domination of the Debtors' auction proceedings, the exclusive control of Debtors' financial affairs, and the concealment of the divestment scheme from the Debtors and the Court, the Debtors did not consent to the divestiture as Real Parties in Interest.

175.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

176.     Defendants' conduct was the cause, or a substantial factor in causing, economic harm to the Debtors' estate.

## IX.

### SIXTH CLAIM

## INDUCING BREACH OF CONTRACT

(Plaintiff Against the Committee and Sager Creek Defendants)

177.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 176.

178.     Debtors entered into services agreements with the Fiduciary Defendants.

179.     The Committee and Sager Creek Defendants knew of the existence of the subject service agreements.

180.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

181.     The Fiduciary Defendants breached their contract with the Debtors as a result.

182.     The conduct of the Committee Defendants and the Sager Creek Defendants caused, or was a substantial factor in causing, the breaches of contracts to occur.

183.     Debtors' estate was financially harmed as a result, in an amount according to proof, but at a minimum including $32.9 million in hard assets, along with the $74 million in avoidance actions.

## X.

## SEVENTH CLAIM

## INTENTIONAL INTERFERENCE

## WITH CONTRACTUAL RELATIONS

(Plaintiff against all Defendants)

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

184.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 183.

185.     There existed two sets of contractual relations at issue: 1) an approved but incipient agreement between Debtors and Seneca Foods, which, absent interference, would result in a binding agreement ("Seneca APA"); and 2) service agreements between the Debtors and the Fiduciary Defendants.

186.     The Defendants knew of the existence of all contracts described herein.

187.     The unlawful conduct of the Defendants prevented Debtors' performance on the Seneca APA; and eliminated the Fiduciary Defendants' performance on their services agreements with the Debtor.

188.     The Defendants intended to disrupt the Debtors' performance on the Seneca APA. Further, the Defendants could not obtain their unlawful goal of divesting the Debtors without compelling the Fiduciary Defendants to breach their duties to the Debtors, and thus implicitly intended to disrupt the Fiduciary Defendants' performance on their contracts with the Debtors.

189.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

190.     Defendants' conduct caused, or was a substantial factor in causing, economic harm to the Debtors.

## XI.

## EIGHTH CLAIM

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

## INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

### (Plaintiff as against all Defendants)

191.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 190.

192.     A contractual relationship existed that, absent interference, probably would have resulted in substantial economic benefit to the Debtors in the form of the Court-approved Seneca APA.

193.     The Defendants knew of the existence of all contractual relations described herein.

194.     The unlawful conduct of the Defendants (i.e. conspiracy and collusion to falsely top the Seneca bid and effect a fraudulent transfer of Debtors' assets for no value), as set forth above, destroyed economic relations with Seneca and divested Debtors of more than $100 million in assets for no consideration.

195.     By engaging in such conduct, Defendants intended that the disruption of the Seneca relationship take place and/or knew that such disruption was substantially certain to occur.

196.     The Defendants intended to disrupt Debtors' performance on the Seneca APA.

197.     The Debtors' relationship with Seneca was disrupted as a result of Defendants' interference.

198.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

199.     The conduct of the Defendants caused, or was a substantial factor in causing, such

economic harm to the Debtors.

\ \ \

\ \ \

## XII.

## NINTH CLAIM

## NEGLIGENT INTERFERENCE WITH

## PROSPECTIVE ECONOMIC RELATIONS

(Plaintiff as against all Defendants)

200.      Plaintiff incorporates by reference the allegations in paragraphs 1 through 199.

201.      A contractual relationship existed in the form of the court-approved Seneca APA, which absent interference would have resulted in substantial economic benefit to the Debtors' estate.

202.      The Defendants knew or should have known of the existence of all contractual relations described herein.

203.      Defendants owed a duty to exercise reasonable care concerning the economic relations between Debtors and Seneca Foods, and knew or should have known that the contractual relations between Debtors and Seneca would be disrupted if Defendants did not act with reasonable care.

204.      The Defendants breached such duty by providing incorrect bid data, negligently failing to reconcile the competitive bids, and thereby mistakenly and negligently concluding that Sager Creek's bid was a higher bid than Seneca's bid.  The mistake resulted in the approval of the Sager Creek APA, which required transfer of Debtors' assets for no value.  The Defendants failed to exercise such reasonable care, and in doing so, destroyed the economic relations with Seneca, thereby divesting Debtors of more than $100 million in assets for no consideration in return.

205.      The Debtors' relationship with Seneca was disrupted.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

206.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors'

assets through the subject auction, the Committee and Sager Creek Defendants intended to induce

a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and

Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to

abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the

execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in

property.

207.     Defendants' negligent conduct of the Defendants caused or was a substantial factor in

causing, economic harm to the Debtors.

**XIII.**

**<u>TENTH CLAIM</u>**

**DECEPTIVE TRADE PRACTICES**

(Plaintiff against all Defendants)

208.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 207.

209.     On or about February 28, 2014, the Defendants' conspired to fraudulently transfer more

than $100 million of Debtors' assets for no consideration to Sager Creek Acquisition Corp.

210.     Defendants did not make required disclosures and report their unlawful objective and the

consequences of their conspiracy to the Court or to the unsecured creditor constituents. Showing

their intent to conceal the unlawful conduct, and to only make partial disclosure after the Rule

60(b) limitations period had expired, Defendant Ball and the Sager Creek Defendants likewise

concealed their unlawful agreements and conduct from governing Federal and State agencies.

211.     Aside from concealing the debt and equity position afforded Defendant Ball by the Sager

Creek Defendants, Defendants achieved their unlawful objective by misrepresenting the economic

values of bids at Debtors' auction through economic artifice, and in doing so deceived Stalking

40

Horse Bidder Seneca Foods, the Debtors, and the Court into believing that Sager Creek Acquisition Corp submitted the highest and otherwise best bid for the Debtors' assets, when the economic value of the bid was actually the lowest bid.

212.     Defendants furthered their conspiracy by providing consideration for participants in the form of up to $18.5 million dollars of Directed Benefit to Defendant Ball, more than $108 million dollars of Directed Benefit to the Sager Creek Defendants, and future contract benefit to the Fiduciary Defendants, Defendant Ball and defendant Ryder.

213.     The Defendants' conduct constitutes a fraudulent transfer as defined by Arkansas Code section 4-59-204, and an unfair and deceptive trade practice as defined by Arkansas Code section 4-88-107.

214.     Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

215.     Defendants' unlawful and intentional conduct of engaging in unfair and deceptive trade practices caused, or was a substantial factor in causing, economic harm to the Debtors.

**XIV.**

**ELEVENTH CLAIM**

**EQUITY**

**RESCISSION AND/OR REFORMATION**

(Plaintiff as against the Fiduciary Defendants)

216.      Plaintiff incorporates by reference the allegations in paragraphs 1 through 215.

217.      Debtors entered into service agreements with the Fiduciary Defendants before and after the filing of the Cases.  The Debtors performed all obligations owed under such agreements.

218.      Plaintiff is informed and believes that the subject agreements may contain exculpatory provisions, or other provisions requiring indemnity by the Debtor or others that survive termination, and operate regardless of fault or contribution by the Fiduciary Defendants.

219.      The covenant of good faith and fair dealing is implied in every contract entered in New York and Arkansas.

220.      On or about February 28, 2014, the Fiduciary Defendants aided and abetted the fraudulent transfer of more than $100 million of Debtors' assets for no consideration to Sager Creek Acquisition Corp.

221.      Thereafter, the Fiduciary Defendants further concealed the unlawful objective, the adverse domination of the Debtors by the Committee Defendants and the Sager Creek Defendants, and the consequences of their conspiracy from the Court.

222.      The Fiduciary Defendants breached the subject contracts, breached their fiduciary duty to Debtors, and violated the covenant of good faith and fair dealing.

223.      The Debtors did not intend to enter into an agreement with the Fiduciary Defendants that permitted those Defendants to retain indemnity or exculpatory benefit from a contract they breached with the Debtors through deceitful and unlawful acts taken against the Debtors' interest.

224.      In equity, Plaintiff requests that, to the extent such agreements contain exculpatory clauses or indemnity provisions in favor of the Fiduciary Defendants that survive termination, that the Court order such contracts rescinded and that the Fiduciary Defendants be compelled by Court order to disgorge and return to Plaintiff all fees obtained from the time of the concealed breach of fiduciary duty to the present.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

225.    Alternatively, in equity, Plaintiff requests that, to the extent such agreements contain exculpatory clauses or indemnity provisions that survive termination by fraud and deceit, that the court order such contracts reformed to render such exculpatory or indemnifying provisions null and void as against public policy, and that the Fiduciary Defendants be compelled by Court order to disgorge and return to Plaintiff all fees obtained during the time of the concealed breach of fiduciary duty.

226.    The unlawful conduct of the Defendants was the direct cause of the Debtors' harm, and/or was a substantial factor in causing such harm.

## XV.

### TWELFTH CLAIM

### EQUITY

### UNJUST ENRICHMENT

(Plaintiff as against all Defendants)

227.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 226.

228.    The Debtors owned property in the form of real and personal property, including more than $74 million in un-rebutted avoidance claims.

229.    Through imposition of adverse domination, fraud, and conspiracy to convert Debtors' assets through the subject auction, the Committee and Sager Creek Defendants intended to induce a breach of the Fiduciary Defendants' respective contracts with the Debtors.  The Committee and Sager Creek Defendants intended through their conduct to compel the Fiduciary Defendants to abandon their fiduciary duties to the Debtors, and to instead participate in, and aid and abet, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

230.    The Defendants misappropriated Debtors' property.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

231.     The Defendants were unjustly enriched by the misappropriation of Debtors' property.

232.     Defendants' misappropriation of Debtors' property caused, or was a substantial factor in causing, economic loss to Debtors in an amount according to proof.


# XVI.

## THIRTEENTH CLAIM

### EQUITY

### EQUITABLE SUBORDINATION AND CLAIM BAR

### DUE TO FRAUD ON THE COURT

(Plaintiff as against all Committee Defendants)

233.     Plaintiff incorporates by reference the allegations in paragraphs 1 through 232.

234.     The Committee Defendants filed claims in the Cases to recover for their unsecured trade debt.

235.     The Debtors owned property in the form of real and personal property, including more than $74 million in un-rebutted avoidance claims, which would have, in part been otherwise available to the Committee Defendants to offset a portion of their claims.

236.     Through imposition of adverse domination, fraud, collusion and conspiracy to convert Debtors' assets through the subject auction to the severe detriment of the estate.  The Committee Defendants participated in, and aided and abetted, the execution of an unlawful conspiracy to divest the Debtors' estate of more than $100 million in property.

237.     In doing so, the Defendants misappropriated Debtors' property.

238.     To the extent that the estate recovers its assets, together with attorney's fees, costs and treble damages, equity demands that, if not barred in total, such Committee Defendants' unsecured trade or other claims in the Cases be equitably subordinated to the unsecured claims of other non-

Committee member creditors.  Only after all non-Committee member unsecured creditors are paid in full, with interest, may the Committee members' claims even be addressed by the Debtor and the Court.

## XVII.

## FOURTEENTH CLAIM

### EQUITY

### DECLARATORY RELIEF

(Plaintiff Against All Defendants)

239.      Plaintiff incorporates by reference the allegations in paragraphs 1 through 238.

240.      <u>Rescission and/or Reformation</u>: An actual, present and justiciable controversy exists between the Plaintiff and Defendants concerning the fraudulent transfer described above, the conspiracy from which it arose, and concealment and lack of candor by the Defendants regarding same. The concealment by the Defendants constitutes a fraud on the Court, the U.S. Trustee, the Debtor and Plaintiff herein.  Plaintiff therefore seeks a declaration by this Court that any and all contracts existing between the Debtors and Defendants herein, to the extent such contracts contain exculpatory or indemnity provisions that survive breach and termination without fault, be rescinded and/or reformed to have no such effect.

## XVIII.

## PRAYER FOR RELIEF

Wherefore Plaintiff requests that the Court award the following in favor of Plaintiff and against Defendants, in excess of the minimum jurisdiction of this court as follows:

FIRST CLAIM - BREACH OF FIDUCIARY DUTY against the Fiduciary Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages

according to proof; together with reimbursement and/or disgorgement of fees paid, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SECOND CLAIM- FRAUDULENT TRANSFER as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

THIRD CLAIM- CONSPIRACY as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

FOURTH CLAIM- AIDING AND ABETTING as Against All Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

FIFTH CLAIM- CONVERSION as Against All Defendants: Compensatory, Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SIXTH CLAIM- INDUCING BREACH OF CONTRACT as against the Committee Defendants

and Sager Creek Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

SEVENTH CLAIM- INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

EIGHTH CLAIM- INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

NINTH CLAIM- NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

TENTH CLAIM- DECEPTIVE TRADE PRACTICES: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential, exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

ELEVENTH CLAIM- RESCISSION/REFORMATION: as against the Fiduciary Defendants: Rescission of the subject contracts, or alternatively, reformation and elimination of exculpatory or indemnity provisions that purportedly survive termination due to breach or fraud; compensatory, consequential, exemplary and treble damages according to proof; interest at the legal rate from the February 28, 2014 to the present, attorneys fees, and costs of suit;

TWELFTH CLAIM- UNJUST ENRICHMENT: as against all Defendants: Plaintiff prays for Judgment to include all compensatory, consequential exemplary and treble Damages according to proof; together with reimbursement and/or disgorgement of fees paid, ill-gotten gains, interest at the legal rate from the February 28, 2014 to the present, all incurred attorneys fees, and incurred costs of suit;

THIRTEENTH CLAIM- EQUITABLE SUBORDINATION AND CLAIM BAR: as against all Committee Defendants: Plaintiff prays for Judgment that all Committee Defendants' unsecured trade or other claims in the Cases be equitably subordinated to the unsecured claims of other non-Committee member creditors.  Only after all non-Committee member unsecured creditors are paid in full, with interest, may the Committee members' claims be even be addressed by the Debtor and the Court, if allowed at all;

FOURTEENTH CLAIM- DECLARATORY RELIEF: as against all Defendants:
To the extent that applicable contracts entered into between Debtors and Defendants herein, to the extent such contracts contain exculpatory or indemnity provisions that survive breach and termination without fault, be rescinded and/or reformed to have no such effect.

PLAINTIFF R. RAY FULMER, II, hereby also requests any other proper and further relief as the Court in its discretion may award.  In the event the matter is referred to U.S. District Court, PLAINTIFF R. RAY FULMER, II, hereby reserves his right to demand a trial by jury.

\ \ \

\\\

\\\

R. Ray Fulmer, II
Ledbetter, Cogbill, Arnold & Harrison, LLP
622 Parker Avenue
P.O. Box 185
Fort Smith, Arkansas 72902
Phone: 479-782-7294
Facsimile: 479-782-1493
rrf@lcahlaw.com

By: Whitney A. Davis
THE LAW OFFICES OF
WHITNEY A. DAVIS
420 Throckmorton Street, Suite 200
Fort Worth, TX 76012
(Texas Bar 24084843)
(California Bar 149523)
Phone: 916-719-6827


and

WILLIAMS &ANDERSON PLC
James E. Smith
111 Center Street, Suite 2200
Little Rock, AR 72202
(Arkansas Bar 77128)
Phone: 501-372-0800
Facsimile: 501-372-6453


/s/James E. Smith_____
James E. Smith
jsmith@williamsanderson.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2016, I electronically filed the foregoing in the above-captioned matter with the Clerk of the Court for the United States Bankruptcy Court in and for the Western District of Arkansas by using the CM/ECF system. I am informed and believe that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT

s/ James E. Smith

**CERTIFICATE**

PLAINTIFF'S CORRECTED AND SUBSTITUTED FIRST-AMENDED COMPLAINT